COMMISSIONER OF BANKING *v.* CHELSEA SAVINGS BANK.

1. PRINCIPAL AND SURETY—CONTRACT—CONSTRUCTION—BOND.

In determining the obligation of a surety, the rules of interpretation and of construction employed are not different from those employed in the interpretation and construction of other written agreements.

2. SAME—INSTRUMENTS REFERRED TO.

In case a bond refers to a written contract between the principal and obligee, the instruments may be considered together.

3. SAME—SURETY BOND—PUBLIC OFFICERS.

Bonds given to secure the State for deposits of public funds made by the treasurer in a bank are not qualified or restricted in the extent of their obligation by the statutory duty of such treasurer to take good and ample security for all deposits made. 1 Comp. Laws, § 1189.

4. SAME—BANKS AND BANKING.

The security so taken, covering by its express condition all deposits made in pursuance of the contract between the treasurer and the bank, includes all deposits for which the bank fails to account, and is not limited to any specific deposit of the amount of the penalty named.

5. SAME—RIGHTS OF SURETY—SUBROGATION.

Upon such failure to account for a sum exceeding the penalty and not fully secured by other bonds, the surety is not entitled to a share of dividends paid to reduce the whole debt.

6. Same—Preference of Sovereignty as Creditor.
  The common-law right of the sovereignty to a preference in the payment of its demands is not enforceable in favor of the surety after the commencement of proceedings to liquidate the assets of the bank, under statutes which do not provide for such priority, and especially after the assets of the bank have been placed beyond its control under 2 Comp. Laws, §§ 6144 *et seq.*

ON REHEARING.

Same—Subrogation of Surety.
  The fact that the bank was closed by act of the commissioner of banking gives the surety no additional right to the enforcement of a priority which has not been asserted by the sovereignty by statute or otherwise.

Appeal from Washtenaw; Kinne, J. Submitted February 28, 1910. (Docket No. 133.) Decided March 19, 1910. Motion for rehearing submitted April 15, 1910. Granted May 7, 1910. Reargued June 30, 1910. Former opinion affirmed July 14, 1910.

Bill by Henry M. Zimmerman, commissioner of banking, against the Chelsea Savings Bank and W. W. Wedemeyer, receiver, to liquidate the assets of defendant bank. On petition the American Surety Company of New York was permitted to intervene and present its claim. From a decree dismissing the petition, petitioner appeals. Affirmed.

*Miller, Smith, Paddock & Perry* ( *Rollin H. Person,* of counsel), for intervening petitioner.

*Martin J. Cavanaugh* ( *John E. Bird,* Attorney General, and *George S. Law,* Assistant Attorney General, of counsel ), for defendant.

In proceedings to liquidate the assets of the Chelsea Savings Bank, the American Surety Company of New York, upon its petition, was permitted to intervene, and the receiver was ordered to answer said petition. The petitioner prayed for an order requiring the receiver to pay to

it the sum of $50,143.40 and interest, or for an order allowing petitioner, as creditor of the bank, to file its claim for that amount and to receive from the receiver ratable dividends thereon.   The receiver filed his answer, there was a replication, and in due season the matter came on for hearing upon pleadings and proofs taken in open court. The decree denied the intervening petitioner relief, and dismissed the petition.   There is little if any dispute about the essential facts.   A rather complete statement of them is necessary to an understanding of the questions presented.

The Chelsea Savings Bank is, or was, a Michigan banking corporation.   Its president and principal stockholder during the period here involved was Frank P. Glazier. During the same period Mr. Glazier held the office of State treasurer.   The intervener is a bonding company authorized to transact business in the State.   It is a duty of the State treasurer, before he shall have made any bank a depository of surplus funds belonging to the State, to require of the bank—

"Good and ample security, to be approved by the said State treasurer, the auditor general and the secretary of State, for the safe-keeping and reimbursement of such surplus funds, whenever called for." 1 Comp. Laws, § 1189.

Under date January 26, 1905, an agreement was made by and between Frank P. Glazier, as State treasurer, and the Chelsea Savings Bank, by the terms of which the said Glazier agreed to make the said bank a depository of a part of the surplus funds of the State "as authorized by law." The bank agreed to receive and safely keep such funds and to reimburse and pay the same to the State treasurer or his successor, or to whoever should be lawfully entitled to receive the same, whenever called for, and to pay interest on such funds at a rate to be from time to time designated by the State treasurer not exceeding 3 per cent. per annum.   The bank applied to intervener for a bond of suretyship in the sum of $50,000 in favor of Frank P. Glazier, State treasurer.   With the ap-

plication were certain statements of alleged facts, and among them the following:

"(6) Estimated average monthly guaranteed deposits for year $200,000. Rate interest 1¾% thereon."

Various questions contained in this application were unanswered, and it was followed by an application similar in form and effect dated in March, 1905, for a bond to take effect on or about March, 1905, and to end on or about January, 1907, in which appears statements relating for the most part to resources and liabilities of the bank which had been omitted from the earlier application. It contains, also, the following:

"III. That we will at all times indemnify and save the surety harmless from and against every claim, demand, liability, cost, charge, expense, suit, order, judgment and adjudication whatsoever and will place the surety in funds to meet every claim, demand, liability, cost, charge, expense, suit, order, judgment or adjudication against it by reason of such suretyship and before it shall be required to pay the same."

There is a further stipulation to the effect that the acceptance by the surety of payment for its suretyship shall not abridge, defer, or limit its right to be subrogated to any right or remedy which the surety otherwise might have or acquire, but that it shall have every right and remedy which an individual surety acting without compensation would have. The premium to be paid was agreed to be $125 per annum. The bank as principal and the intervener as surety executed and delivered to the State treasurer a bond, dated February 25, 1905, but actually delivered about March 9, 1905. This bond and the agreement of the bank and the State treasurer hereinbefore referred to were together received by the State, and on April 10, 1905, were approved by the auditor general, the deputy State treasurer and the deputy secretary of State, and filed. It is here set out:

"Know all men by these presents, that the Chelsea Savings Bank of Chelsea, Michigan, as principal, and the

American Surety Company of New York, a corporation of the State of New York, having its principal office in the city of New York, and having complied with the laws of, and being authorized to do business in, the State of Michigan, as surety, are held and firmly bound unto Frank P. Glazier, as treasurer of the State of Michigan, in the full sum of fifty thousand dollars ($50,000.00), to the payment of which well and truly to be made, we bind ourselves, our successors and assigns, jointly and severally, firmly by these presents.

"Sealed with our seals and dated this 25th day of February, A. D. 1905.

"The condition of the above obligation is such that, whereas, the above named bank, principal herein, has been designated by the said Frank P. Glazier, as treasurer of the State of Michigan, as one of the depositories of the surplus funds belonging to the State of Michigan; and whereas, the said Frank P. Glazier, as such treasurer, has entered into a certain contract with said bank, principal herein, with reference to the said surplus funds so to be deposited with it, a copy of which is hereto attached, and made a part hereof; now, therefore, if the above bounden bank as principal shall, in accordance with the said contract, safely keep and reimburse and pay over upon demand all moneys belonging to the said State of Michigan, and deposited with it by the said State Treasurer, in accordance with the said contract, to the said State Treasurer, his successor or successors in office, or to any other person lawfully entitled to receive the same, and shall in all things perform the conditions of said contract, then this obligation to be void, otherwise to remain in full force and effect.

"It is mutually understood and agreed between the parties hereto that if the said surety shall so elect, its liability for future actions or omissions of said principal may be terminated by giving thirty (30) days' notice in writing to the said Frank P. Glazier, as treasurer as aforesaid, or his successor or successors in office, and a like notice to the secretary of State and auditor general of said State; and the liability of said surety for the future actions or omissions of said principal shall cease at the expiration of said thirty (30) days, the said surety remaining liable for all or any acts of commission or omission covered by this bond or said contract, up to and including the date of expiration of said thirty (30) days' notice.

"The said surety shall, upon the termination of this bond, and its release from all liability hereunder, upon request, refund the premium paid, less a *pro rata* part thereof for the time this bond shall have been in force.

"It is mutually understood and agreed that said surety shall be liable hereunder for only such proportion of the total loss sustained by the said Frank P. Glazier, as treasurer of the State of Michigan, or his successor or successors in office, as the penalty of this bond shall bear to the total penalties of all bonds furnished by said Chelsea Savings Bank as principal in favor of said State treasurer, and in no event shall the surety hereon be liable hereunder for any sum in excess of the penalty of this bond.

"In witness whereof, the said Chelsea Savings Bank as principal has hereunto affixed its corporate seal, and caused this instrument to be signed by its president and cashier, and the said American Surety Company of New York, as surety, has executed this instrument in accordance with the proper resolutions respecting the execution of instruments of this character, and affixed its corporate seal."

It remained in force up to and including February 13, 1908. During the period from December 28, 1905, to January 6, 1906, no State funds were on deposit with the bank. At the end of January there was deposited more than $300,000. During the year 1906, and after January 19th, the deposit was never less than $236,000, and in October it reached $585,000. In 1907, except for a period early in January, the deposit was never less than $500,000. On or about December 18, 1907, the Chelsea Savings Bank suspended, at which time it was the depository of surplus State funds to the amount of $685,587.79. Demand was regularly made by the State for repayment of said moneys and none were paid. The bank was insolvent, and was closed by the State banking commissioner pursuant to the statutes of the State, and a receiver was duly appointed, qualified, and entered upon performance of his duties. The receiver testified that the least value placed upon the assets of the bank was more than $685,000; that he had distributed in dividends or had on hand to distribute about $536,382.22, and hoped to collect for distribution $100,000

additional. He had paid upon savings deposits 60 per cent. and on commercial deposits 40 per cent. The Chelsea Savings Bank furnished to the State as security for State deposits and there were outstanding when the bank was closed, bonds as follows:

The Title Guaranty & Trust Company.............$25,000
Federal Union Surety Company.................. 57,500
The Bankers' Surety Company ................. 17,500
The Metropolitan Surety Company.............. 25,000
United States Fidelity & Guaranty Company ...... 25,000
American Surety Company of New York.......... 50,000

—aggregating in all the sum of $200,000.

Intervener, upon the demand of the State, paid the face of its bond, with interest. Its contentions are:

"*First.* We contend that where a creditor having a means of satisfying the debt relinquishes or loses it by his wilful acts or negligence, the surety will be discharged, being released by any act of the creditor which deprives the surety of the right of subrogation. We apply this principle on the theory that the State is entitled to priority in the payment of its debts, and that the State could have received full payment had she taken advantage of her prerogative. That this would have operated to the benefit of the surety either by absolving it from payment, or, if it had paid, by placing in its control a right of subrogation which would have resulted in full repayment.

"*Second.* We contend that the obligation of the American Surety Company did not extend beyond the loss sustained by the State on this particular bond, and that the deposit covered by this bond was a separate and distinct debt, which the surety has paid in full, entitling it, therefore, to be repaid out of the assets of the bank on well-recognized principles of subrogation.

"*Third.* We contend that, where there is a bond in a fixed amount to secure a floating balance which may exceed that amount, the surety is entitled to have the dividends from the insolvent estate prorated to the whole debt, and that surety is entitled either to the dividends on the secured part he has paid in full or to have the prorated part of the dividend applied in diminution of the amount he has to pay.

"*Fourth.* That the agreement of indemnity given by

the bank to the surety company took effect as of its date immediately upon payment on the bond, and that such agreement entitled the surety to stand as a creditor of the bank and receive its share of any dividends paid."

As to the interpretation of the bond and the extent of the surety's obligation, it is further contended:

"(1) As a provision limiting the surety's liability, and as one of the terms of the bond, when read in connection with the statute, it was distinctly agreed that the State treasurer should never deposit in the bank a dollar of State surplus funds in excess of the aggregate penalties of the bonds furnished.

"(2) It having been so agreed that for every dollar of deposit there must be an equivalent penalty in some bond, this further provision was inserted:

"'It is mutually agreed and understood that the said surety shall be liable hereunder for only such proportion of the total loss sustained by the said Frank P. Glazier, as treasurer of the State of Michigan, or his successor or successors in office, as the penalty of this bond shall bear to the total penalties of all bonds furnished by said Chelsea Savings Bank as principal, in favor of said State Treasurer.'

"(3) The rights and the liability of the surety must be determined as if the treasurer had complied with these provisions of the bond, and had not deposited more than two hundred thousand dollars, the aggregate penalties of all the bonds given. So far as this surety is concerned it is as if no more than two hundred thousand dollars had been deposited. Or, which is the same thing, as if the treasurer had taken bonds with penalties in the aggregate equaling the deposits. Because such was the liability which it assumed, and not some other different liability. In other words, the liability assumed by the surety on this bond, cannot be increased nor can its rights be diminished, by the treasurer's violation of the terms of the bond.

"(4) When the bond agrees that the loss shall be proportioned, it necessarily also agrees that the dividends shall be apportioned. Because the loss cannot be proportional, without apportioning all payments whether by dividend or otherwise.

"(5) Wherefore, by the express terms of the bond itself, this surety is entitled to its proportional share of the dividends; that is, to dividends upon fifty thousand dollars,

the amount of the indebtedness which it has paid. It may be urged that the entire scheme for depositing State money in this bank was illegal and against public policy. If this were so, which I do not here wish to take the responsibility of either admitting or denying, even then, the State can no more be permitted to refuse apportionment of the dividends than it could be permitted to refuse change on accepting a hundred dollar bill in payment of a fifty dollar liability. It ratified the bond, after the event, with full knowledge of the facts, at least so far as to demand and receive payment upon it, and it cannot ratify it in part, without ratifying it as a whole. The doctrine of public policy cannot be made use of to increase the surety's liability. That would be a still greater breach of public policy. The liability of the surety was fifty thousand dollars, less its proportion of the dividends. Nothing more."

In behalf of the receiver it is asserted, *first*, that a surety is not entitled to subrogation upon payment of a part of the debt; *second*, that the debt, in this case, is the whole amount due from the bank to the State; *third*, that the bond given by the intervener affords protection to the State for any ultimate balance arising out of the dealings between the State and the bank as a depository of State moneys; *fourth*, that the State is not entitled to a priority.

OSTRANDER, J. (*after stating the facts*). In determining the obligation of a surety, the rules of interpretation and of construction employed are not different from those employed in the interpretation and construction of other written agreements. In the case presented there is a bond which refers to a contract between the principal and the obligee in the bond. These instruments may be considered together. It appears that the treasurer of the State, the obligee in the bond, agreed with the Chelsea Savings Bank, the principal in the bond, to make it a depository of a part of the surplus funds of the State and that the bank agreed to accept and safely keep, account for and pay over on demand " to the amount of the funds so deposited," and to pay interest upon " all such surplus

funds of said State of Michigan as may be offered or deposited by said State treasurer."

The condition of the bond is that if the said bank shall, in accordance with said contract, safely keep and reimburse and pay over upon demand all moneys belonging to the said State of Michigan, deposited with it by said State treasurer in accordance with said contract, etc., "then this obligation to be void, otherwise, to remain in full force and effect."

The language employed is not ambiguous; the ordinary meaning thereof is not doubtful. In terms the liability of the surety is that of the principal, limited only by the penalty of the bond and by provision for paying no more than such proportion of the total loss sustained by the treasurer of the State as the penalty of this bond bears to the total of the penalties of all bonds furnished by said bank as principal in favor of said State treasurer. It is said that the express obligation of the surety denoted by the terms of the contract and bond is modified and restricted by the statute; that there was, in effect, an agreement that for all moneys of the State deposited in the bank security would be taken; that this is recognized and is indeed contracted for in the term " as authorized by law," employed in the agreement of the State treasurer and the bank. It is not to be supposed that the State, in accepting security, however ample, released the right to rely, also, upon the property of the bank. Assuming the legislature to have intended that the good and ample security required should be distinct and separate from and in addition to the credit and security afforded by the assets of the bank and the liability of its stockholders, it is a provision exclusively for the protection of the interests of the State. If otherwise construed, if it is held that the statute qualifies the contract of every surety and amounts to an agreement between the State and those furnishing security pursuant to the statute, that there will be no breach of the official duty to require *"good and ample security,"* the whole purpose of the law is liable to be defeated by a careless or wilful

failure to obey the law. The term above referred to, employed in the agreement to deposit, must be given a meaning in harmony with this construction of the statute, and must be held to mean that the designation of the bank as a depository of State funds is an official, authorized designation. The provision in the bond which limits liability of the surety to such a proportion of the total loss sustained as the penalty of the bond bears to the aggregate penalties of all bonds is effectual, according to its terms and its reasonable intent, without reference to the statute. The accounts of the State with banks of deposit are, of necessity, fluctuating. In a particular case, the amount on deposit might be much less than the aggregate of the security furnished. It follows that a violation of the statute cannot be complained of by the surety, and the statute in no respect modifies the express obligation of the surety to respond, as the principal should respond, to the amount of the penalty. *City of Detroit* v. *Weber*, 26 Mich. 284.

The debt due to the State from the bank is the sum of all deposits. The bank, the principal in the bond, has not paid the debt and upon its failure so to do the surety became at once liable to pay the amount which it had agreed to pay. The surety has paid. It paid the entire penalty of the bond because the debt due to the State from the bank exceeded in amount the aggregate of the penalties of all bonds. The debt of the State has not been paid. The State is proceeding, as a creditor of the bank, to secure and it has accepted, as they have been divided by the receiver, such proportion of the assets of the bank as its debt bears to the total of debts of the bank allowed by the court. It appears that this proportion of the assets will not pay the State or any other creditor in full. The contention of the surety that there has been no loss to the State as to that part of the deposit which it secured, that so much of the deposit as it secured was a separate and distinct deposit and debt, that therefore it has paid the debt in full and is entitled, to that extent at least, to

be subrogated to the claim of the State against the bank and to recover dividends, requires little consideration further than it has already, inferentially, received. We reject the theory that a particular bond furnished by a depository of State funds, conditioned like the bond in question here, should be treated as securing a particular deposit of funds. And this as well when the State has the "good and ample security" which the intervener says it should have taken as when it has not. The deposits in the Chelsea Savings Bank were made, generally, from time to time, and were from time to time withdrawn. That this would be the course of affairs was to be expected, and that it was so understood is evident. All security was given and accepted for all of the deposit, whatever the amount of the deposit might be. If intervener secured and intended to secure any particular deposit of $50,000, it had no occasion to provide that it should pay no greater part of any loss than the proportion of the penalty of its bond to the total penalties of all bonds. Its undertaking is that its principal shall repay all moneys deposited, and it must be construed as a security for the whole debt. It is conceded, and the authorities cited by counsel for the intervener sustain the concession and the general rule, that in such a case the guarantor is not entitled to a share of the dividends which are declared and paid in reduction of the whole debt. 1 Brandt on Suretyship & Guaranty (3d Ed.), § 277; *Ellis* v. *Emmanuel*, L. R. 1 Excheq. Div. 157; *Dumont* v. *Fry*, 14 Fed. 293.

If the State is of right entitled to a preference and to have debts due to it paid to the exclusion of other creditors, the assets of the bank would have paid the demand substantially in full. Neither in the Constitution nor in the statutes of the State is the right of the State to a preference and priority over other creditors distinctly asserted. If the right exists it is as a prerogative of sovereignty. Successive Constitutions of the State have declared, generally, that the common law shall remain in force, and it is not doubted that by the common law of England it was

a prerogative right of the sovereign, with some exceptions and limitations, to have debts due to him paid ahead of debts due to his subjects. Whether the States of the Union, independent of statute declarations, have such right, is a question which has received judicial consideration in some of the States. A collection of cases will be found in a note to *Freeholders of Middlesex County* v. *State Bank at New Brunswick*, 30 N. J. Eq. 311. See, also, *United States Fidelity & Guaranty Co.* v. *Rainey*, 120 Tenn. 357 (113 S. W. 397); *State* v. *Foster*, 5 Wyo. 199 (38 Pac. 926, 29 L. R. A. 226, 63 Am. St. Rep. 47); *Seay* v. *Bank of Rome*, 66 Ga. 609; *Giles* v. *Grover*, 9 Bing. 128 (House of Lords Cases).

The decisions of State courts are not uniform.

The question is not presented for decision in this case unless, assuming the right to exist, the intervening surety may insist upon the exercise of the right by the State. The statute, 2 Comp. Laws, § 6144 *et seq.*, points out the procedure when a State bank has become insolvent. The general banking law, of which the sections referred to are a part, was enacted long after the statute authorizing the deposit of State funds in banks, and it has been since its passage many times amended. The funds of a bank, the possession of which is taken under this act by an officer of the State, are required to be paid, as collected, to the State treasurer. There is no provision for retaining out of such funds moneys due to the State, excluding other creditors of such a bank. On the contrary, ratable dividends are to be made (section 6146) from time to time on all such claims as may have been proved. Without treating the action of the banking commissioner in closing the Chelsea bank as the precise legal equivalent of a fair and bona fide assignment by the bank of its assets for a valuable consideration, it is nevertheless true that the proceedings taken passed all the property of the bank beyond its power or control. This, being the result of enforcement of the State law, should have an effect equal to an assignment for benefit of all creditors. Such an assignment could not

be avoided by the crown nor could it lay claim to goods seized by the sheriff on *fieri facias* and sold. *King* v. *Lee*, 6 Price, 369; *Giles* v. *Grover*, 1 Cl. & Fin. 72; *King* v. *Watson*, 3 Price, 6; 2 Tidd's Practice, pp. 1098, 1099; Chitty's Prerogative of the Crown, 281, 284, 285; *State* v. *Bank of Maryland*, 6 Gill & J. (Md.) 205 (26 Am. Dec. 561).

The principle proceeded upon seems to be that the right of priority of the sovereign attaches, as does the right of any lienor, only upon seizure under or enforcement of the proper writ. We do not hesitate to say that, assuming the right of priority contended for to exist in this State, the courts, in the absence of any assertion of the right by the State, and after the debtor has been divested of all control of its property in proceedings authorized by and following the statutes of the State, should not, *sua sponte*, assert the right in favor of a guarantor of the debtor.

The decree is affirmed.

MONTGOMERY, C. J., HOOKER, BLAIR, and STONE, JJ., concurred.

### ON REHEARING.

OSTRANDER, J. We said in the foregoing opinion, concerning the question of the prerogative right of the State as creditor to be preferred to other creditors of the debtor:

"The question is not presented for decision in this case, unless, assuming the right to exist, the intervening surety may insist upon the exercise of the right by the State."

We proceeded then to apply the rule that at the common law the right of the sovereign to priority over other creditors of a debtor was one which must be asserted before the assets of the debtor. had passed beyond his control. On the application for rehearing it was urged that the opinion did not meet the contention that the intervening petitioner is, as to the State, a surety of the debtor, and

that the State itself, by its officers, instituted the action which divested the debtor of its property. The opinion does not answer precisely this contention, for which reason and because one of the justices who took part in the decision had left the bench before the motion for rehearing was presented, it was ordered that the cause be reheard.

In the former opinion some reference is made to authority. Further references are: The note to 1 Kent's Commentaries, star page 248; *State* v. *Williams*, 101 Md. 529 (61 Atl. 297, 109 Am. St. Rep. 579, 4 Am. & Eng. Ann. Cas. 970, 973, and note, 1 L. R. A. [N. S.] 254, and note); *In re Receivership of Columbian Insurance Co.*, 3 Abb. Dec. (N. Y.) 239; *Central Trust Co.* v. *Railroad Co.*, 110 N. Y. 250 (18 N. E. 92, 1 L. R. A. 260); *In re Ginsburg*, 59 N. Y. Supp. 656. The cases arose upon the assertion in some form of the alleged right of the State. The opinions relied upon by appellant are judicial assertions that in the particular jurisdiction this prerogative right of sovereignty, as recognized by the common law, has been asserted by the very act of adopting the common law into the jurisprudence of the State, and therefore may be enforced by the courts. This is the form of the contention made by appellant, and it is this alleged right of the State which it is claimed should have been exercised in the particular case, and that the surety stands, before the law, in the position it would have occupied had the State exercised the right. A royal prerogative is an arbitrary power vested in the executive, a power or will which is discretionary and uncontrolled (2 Bouvier [Rawle's Rev.], p. 730) and in some, if not all, of the decisions which have been examined the term "prerogative" is evidently employed in the sense that it is an arbitrary power of the State, as distinguished from a sovereign power, which becomes effective in exercise through legislation. It is clear that no one may complain because the sovereign has not exercised a discretionary and arbitrary

right.  The argument made for appellant is thus completely answered.

We do not doubt that the State may provide by legislation for a preference of payment of demands due to the State.  The legislatures of some of the States and the congress of the United States have, to some extent, given a preference to demands due to the government.  The right to do this is inherent in the State.  It is exercised in this State, in a limited way, in the collection of the revenues. It has at all times been, as it now is, within the power of the legislature to make such provisions for State priority as seemed to be expedient.  It has made none for cases like the one at bar.  The form of our government, the undoubted power of the legislature in this behalf, furnish reasons for saying that in adopting the applicable rules of the common law as a part of the law of the State, the people did not adopt and thereby assert an arbitrary, prerogative right to priority of payment of its debts, which was recognized by the common law.  In any event, the State has never asserted, and does not now assert, such a right.

We conclude that appellant has been denied no right, and the decree of the court below is affirmed.

HOOKER, MOORE, MCALVAY, BROOKE, and STONE, JJ., concurred.  BLAIR, J., concurred in the result.