## EQUITABLE TRUST CO. OF NEW YORK v. CONNECTICUT BRASS & MFG. CORPORATION et al.

(Circuit Court of Appeals, Second Circuit. April 30, 1923.)

No. 211.

1. **Courts ⊜⇒343—Not an abuse of discretion to permit United States to intervene.**

It was not an abuse of the trial court's discretion to permit the United States to intervene in receivership proceedings to claim priority of payment from assets in the hands of the receiver, where the right was not challenged by any of the parties, even if it be assumed there was no absolute right of intervention under equity rule 37 (198 Fed. xxix, 115 C. C. A. xxix), permitting any one claiming an interest in the litigation to assert his right by intervention in subordination to and recognition of the propriety of the main proceeding.

2. **United States ⊜⇒76—Does not have common-law priority over English sovereign.**

Since there is no common law of the United States, the priority given by the common law to all debts due the English sovereign cannot be claimed by the United States, but any claim to priority for payment of debts due must be based on statute.

3. **United States ⊜⇒76—Mere insolvency of living debtor does not entitle United States to priority under statute.**

Rev. St. § 3466 (Comp. St. § 6372), giving the United States priority when any debtor is insolvent, or when the estate of a deceased debtor is insufficient to pay his debts, and extending the priority to cases in which the insolvent debtor makes a voluntary assignment, or the effects of an absconding, concealed, or absent debtor are attached, as well as to cases in which an act of bankruptcy is committed, does not give the United States the right to priority in payment on a showing merely that a living debtor is insolvent, but it must further be shown that one of the three conditions specified by the statute also exist.

4. **Trusts ⊜⇒352—Constructive trust arises against fund into which proceeds from conversion by bailee have been commingled.**

Where a bailee of property converts it to his own use, a constructive trust arises in favor of the bailor, which not only can be enforced against the specified property, if it can be traced, but can also be enforced against proceeds of the conversion of that property, even after they have been commingled with other funds of the bailee.

5. **Bailment ⊜⇒21—Trusts ⊜⇒136½—Property held by bailee or trustee cannot be subjected to payment of his debt.**

Since a trustee or bailee cannot use property which he holds in trust for his own benefit, such property cannot be subjected by his creditors to the payment of his debts.

6. **Election of remedies ⊜⇒3(2)—Election to assert debt for value of property converted bars remedy on theory of title.**

Where a bailee has converted property to his own use, the election by the bailor to enforce a claim for the value of the property as a debt of the bailor is equivalent to an election to recover the value by assumpsit, and it treats the title as having vested in the bailee, so that it bars a subsequent attempt to assert a remedy for the conversion, based on the theory that the title remained in the bailor.

7. **Election of remedies ⊜⇒3(1)—Replevin and trover are inconsistent remedies against bailee.**

Since all remedies which proceed on the theory that title to property is in the claimant are substantially inconsistent with those which proceed on the theory that it is in the defendant, the remedies of replevin and trover against a bailee who has converted the property intrusted to him

---

⊜⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

are inconsistent, and the assertion of one of them precludes resort to the other.

**8. Creditors' suit ☞36(1)—Petition by contract creditor for receiver held not to fix lien on debtor's assets.**

A petition by a creditor for the appointment of a receiver of the debtor corporation, which did not allege that the plaintiff was a judgment creditor, was not a technical creditors' bill, and therefore created no lien which would be superior to claims accruing against the corporation after the filing of the suit.

Appeal from the District Court of the United States for the District of Connecticut.

Suit in equity by the Equitable Trust Company of New York against the Connecticut Brass & Manufacturing Corporation for the appointment of an ancillary receiver. From a decree dismissing the petition of the United States for intervention to compel the receiver to pay the claim of the United States against the defendant corporation in preference to all other claims, the United States appeals. Affirmed.

See, also, In re Connecticut Brass & Mfg. Corporation, 257 Fed. 445.

The Connecticut Brass & Manufacturing Corporation, hereinafter called the defendant, is a corporation organized and existing under the laws of the state of Delaware, and having its principal office in Wilmington, in said state. Prior to the bringing of the present suit the Equitable Trust Company of New York, hereinafter called the plaintiff, as a creditor had brought suit against this defendant in the United States District Court for the District of Delaware and obtained the appointment of a receiver of all the defendant's property, with power to conduct the defendant's business during such period as the court might approve. It was alleged that defendant's assets amounted at a fair valuation to $1,000,000, together with accounts receiverable and other quick assets which aggregate at a fair valuation $700,000, and that its liabilities amount in all to $1,265,000. It was also alleged that the business had been grossly mismanaged by the vice president and managing director, who had resigned a short time prior to the bringing of the suit.

Thereafter the plaintiff, as a creditor, commenced a suit against the same defendant in the United States District Court for the District of Connecticut, in which it asked for the appointment of an ancillary receiver of the property of the defendant in the district of Connecticut, and prayed the court to empower the receiver to conduct the defendant's business within the district during such period as the court approved, and that the receiver be granted all other powers ordinarily vested in receivers in such cases, and it asked that all creditors, stockholders, and other persons be enjoined until the further order of the court from instituting or prosecuting, or continuing the prosecution of, any actions, suits, or proceedings at law or in equity against the defendant in any court within the district. It also asked the court to fully administer such of the defendant's property as might be within the district, and determine the respective rights, liens, and priorities of the creditors, and that it make such orders respecting the sale or other disposition of the property and the application of the proceeds of any sale as the circumstances of the case required. It alleged, too, that all the defendant's plants and almost all its other assets (stated to be worth at a fair valuation $1,700,000) were located in the district of Connecticut.

The defendant, in its answer to the bill filed in the Connecticut suit, admitted all the averments contained in said bill and joined in the prayers thereof. The ancillary receiver, as asked, was appointed on September 5, 1918.

Three years later the United States was given leave to intervene in the Connecticut suit. The intervening petition alleged that during the year 1918

the United States supplied the defendant with 2,216,693 pounds of copper for the manufacture of war munitions under certain contracts entered into between the United States and the defendant, which contracts provided that title to said copper should remain in the United States, and that $895,200 pounds of copper had been expended on said contracts, leaving a balance due the United States of 1,321,493 pounds of copper, of the value of $343,588.18, at the rate of 26 cents per pound, and that the defendant had wrongfully and improperly converted to its own use 1,321,493 pounds of copper. It also alleged that, although the defendant was indebted to the United States in the sum of $343,588.18, with lawful interest thereon, by reason of the wrongful conversion of said copper, and although demand had been made therefor, neither said sum nor any part thereof had been paid to the United States, and the whole of said sum, with lawful interest thereon, was due.

The United States asked that an order be entered instructing the ancillary receiver to pay the claim of the United States forthwith, with interest, and before any other debt should be paid, asserting that its claim was entitled to a preference over all other claims in accordance with the provisions of section 3466 and 3467 of the Revised Statutes of the United States (Comp. St. §§ 6372, 6373). An order or decree was thereafter made by the District Judge of Connecticut, which determined that the United States was not entitled to the priority of payment which it asserted, and dismissed the petition of intervention.

Cummings & Lockwood, of Stamford, Conn. (Charles D. Lockwood, of Stamford, Conn., of counsel), for ancillary receiver.

Murray, Prentice & Aldrich, of New York City (William Roberts, of New York City, of counsel), for creditors' committee.

Allan K. Smith, U. S. Atty., of Hartford, Conn.

Before ROGERS, HOUGH, and MAYER, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). It appears that a New York corporation obtained in the district of Delaware the appointment of a receiver by a decree entered on August 31, 1918, of all the property of the defendant, a Delaware corporation, with power to conduct the defendant's business. Thereafter the New York corporation filed a bill in the District Court of Connecticut in which it asked that court to appoint the Delaware receiver an ancillary receiver over the defendant, and alleged that all of the defendant's plants and almost all of its assets were located in the district of Connecticut, and that almost all of its business was carried on there. This application was granted on September 4, 1918. On September 6, 1921, the United States moved for leave to intervene in the suit in the District Court of Connecticut and to be made a party defendant. Its petition alleged that the defendant was indebted to it in the sum of $343,588.18, with interest, and that its claim was entitled to be preferred over all other claims in accordance with the provisions of sections 3466 and 3467 of the Revised Statutes of the United States. It asked that the ancillary receiver be instructed to pay the said claim forthwith, with interest, and before any other debt of the defendant corporation was paid. The court granted leave to intervene. Thereafter, the cause having been heard upon the intervening petition, its petition was dismissed by an order or decree signed on September 28, 1922. This dismissal was based on the ground that the United States did not possess the right of priority which it asserted. The United States thereupon appealed to this court.

If the United States had asked in its petition of intervention for an order on the receiver for a delivery to it of the copper which it delivered to the defendant under its contract with it, in which it was expressly agreed that the title to the copper should remain in it, the United States would have acted in accordance with the usual and proper procedure. Winchester v. Davis Pyrites Co. (C. C.) 64 Fed. 664, affirmed in 67 Fed. 45, 14 C. C. A. 300. That was not, however, the course pursued. It asked instead to be permitted to intervene to assert the priority of its claim over all other claims. The plaintiff, in its complaint, asking for the appointment of an ancillary receiver in the district of Connecticut, asked that the indebtedness of the defendant to the plaintiff and to all other creditors be ascertained, and that the court administer the defendant's property and determine the respective rights, liens, and priorities of the defendant's creditors, and the order appointing the ancillary receiver had authorized him to carry on the defendant's business within the district to such extent and in such manner as would in his judgment produce the best financial results. But it does not appear that any order had ever been entered or any steps taken to determine the respective rights, liens, or priorities of the defendant's creditors. If the ancillary receiver had not been authorized to conduct the defendant's business, and the purpose had been simply to wind up the defendant's business in the state of Connecticut, collect the assets, and determine the respective rights, liens, and priorities of the creditors, there would clearly have been no necessity for any intervention by the United States as the government might have appeared before a master on reference and proved its claim in accordance with the order of reference. To permit a creditor to intervene under such circumstances on the ground that his claim was entitled to a priority would certainly have been an unusual and unnecessary course of procedure. The fact that intervention was allowed in this case was no doubt due to the fact that the ancillary receiver was carrying on the business, and in doing so might prejudice the payment in full of the claim of the United States, if it should be found entitled to priority over all other claims.

[1] While intervention seems to have been employed to some extent in the ecclesiastical courts of England, and was permitted in the courts of bankruptcy, it was not recognized at common law; and it has been said that there can be no intervention in a suit in equity, in the absence of a statute authorizing it. The Rules of Practice for the Courts of Equity, promulgated by the Supreme Court on November 4, 1912, and which became effective February 1, 1913, made provision for intervention in equity in the federal courts. Rule 37 (198 Fed. xxix, 115 C. C. A. xxix) declares that:

"* * * Any one claiming an interest in the litigation may at any time be permitted to assert his right by intervention, but the intervention shall be in subordination to, and in recognition of, the propriety of the main proceeding."

In some cases intervention is an absolute right, while in others it rests in the discretion of the trial court. Glass v. Woodman, 223 Fed. 621, 623, 139 C. C. A. 167. If we assume that the United States had

no absolute right of intervention, it was certainly within the trial court's discretion, under the circumstances of this case, to grant the original intervention, and we cannot say that in doing so its discretion was abused. Indeed, the right to permit the intervention was not challenged by any of the parties; but, having granted it, did the court commit error in thereafter dismissing the petition of intervention on the ground that the claim asserted by the United States was not entitled to priority of payment out of the assets in the receiver's hands?

[2] 1. We think it clear that whatever claim to priority the United States may assert does not rest upon the theory of sovereignty. It is no doubt true at common law that a sovereign is entitled to priority over the claims of individual creditors. That such a priority can be asserted by the sovereign was recognized in England in the earliest reported cases. The rule was enunciated by Lord Coke in Quick's Case, 9 Rep. 129b, and in Rex v. Wells, 16 East, 278 (1812), Mac-Donald, C. B., said:

"I take it to be an incontrovertible rule of law that, where the king's and the subjects' title concur, the king's shall be preferred. Except so far as the Legislature has thought fit to interfere, the rule is one of universal application, and perhaps not unreasonable, when it is considered that, after all, it only means that the interests of individuals are to be postponed to the interests of the community."

The rule was applied in the House of Lords in the recent case of New South Wales Taxation Commissioners v. Palmer, [1907] A. C. 179.

There seems a marked difference of opinion in the several states as to whether or not the prerogative of the crown has been adopted by the states as part of their common law. It has been held in some states that it has been adopted. In re Carnegie Trust Co., 206 N. Y. 390, 99 N. E. 1096, 46 L. R. A. (N. S.) 260; United States Fidelity & Guaranty Co. v. Rainey, 120 Tenn. 357, 113 S. W. 397; State of Maryland v. Bank, 6 Gill & J. 205, 26 Am. Dec. 561. While in certain other states, if the right exists at all, it is dependent entirely upon statute. Freehold of Middlesex County v. State Bank at New Brunswick, 29 N. J. Eq. 268, affirmed 30 N. J. Eq. 311; Commission of Banking v. Chelsea Savings Bank, 161 Mich. 691, 125 N. W. 424, 127 N. W. 351; Potter v. Fidelity & Deposit Co. of Maryland, 101 Miss. 823, 58 South. 713.

Whatever the rule may be in the several states, the question whether the United States has a common law of its own is quite a different matter. The Supreme Court has said on numerous occasions that there is no common law of the United States. In the famous case of Wheaton v. Peters, 8 Pet. 591–658, 8 L. Ed. 1055, in which Henry Wheaton sued for an infringement of the copyright in Wheaton's Reports, and in which it was held that the reporter of the court's decisions can have no copyright in the opinions of the court, Mr. Justice McLean, writing for the court, said:

"It is clear there can be no common law of the United States. The federal government is composed of 24 sovereign and independent states, each of which may have its local usages, customs, and common law. There is no

principle which pervades the Union, and has the authority of law, that is not embodied in the Constitution or laws of the Union. The commôn law could be made a part of our federal system only by legislative adoption."

In Smith v. Alabama, 124 U. S. 465, 478, 8 Sup. Ct. 564, 569 (31 L. Ed. 508), Mr. Justice Matthews, speaking for the court, said:

"There is no common law of the United States, in the sense of a national customary law, distinct from the common law of England as adopted by the several states each for itself, applied as its local law, and subject to such alteration as may be provided by its own statutes."

In 1832, in United States v. State Bank of North Carolina, 6 Pet. 29, 35, 8 L. Ed. 308, the court, speaking through Mr. Justice Story, referring to the right of priority of payment of debts due to the government as being a prerogative of the crown well known to the common law, stated that the claim of the United States to priority of payment—

"does not stand upon any sovereign prerogative, but is exclusively founded upon the actual provisions of their own statutes."

But in Dollar Savings Bank v. United States, 19 Wall. 227, 239 (22 L. Ed. 80)', in an opinion written by Mr. Justice Strong for the court it was said:

"It may be considered as settled that so much of the royal prerogatives as belonged to the king in his capacity of parens patriæ, or universal trustee, enters as much into our political state as it does into the principles of the British constitution."

But that case did not involve the question now under consideration, and has never been understood, notwithstanding the generality of the language used, as intended to assert that the United States possesses a right at common law to priority of payment over other creditors. In that case the court was construing a statute which created a right and provided a particular remedy for its enforcement. All that was decided was that such a statute, by impliedly prohibiting other remedies than the one it gave, did not bind the government; it not being named therein. And in Marshall v. New York, 254 U. S. 380, 382, 41 Sup. Ct. 143, 65 L. Ed. 315, Mr. Justice Brandeis, speaking for the court, said:

"At common law the crown of Great Britain, by virtue of a prerogative right, had priority over all subjects for the payment out of a debtor's property of all debts due it. The priority was effective alike, whether the property remained in the hands of the debtor, or had been placed in the possession of a third person, or was in custodia legis. The priority could be defeated or postponed only through the passing of title to the debtor's property, absolutely or by way of lien, before the sovereign sought to enforce his right. * * *"

The court held that a like right of priority, based on sovereign prerogative, belongs to the state of New York, as her highest court had decided. But the first Constitution of New York had provided that the common law of England, which, together with the statutes, constituted the law of the colony on April 19, 1775, should be the law of the state, subject to such alterations as the Legislature might there-

after make. This provision was embodied in substance in the later Constitutions of the state.

[3] 2. As the United States has no common law, whatever right of priority in the payment of debts the United States possesses over other creditors exists because of some statute which confers it. It does not exist independently of statute. The priority claimed in this case is based upon section 3466 of the Revised Statutes (Comp. St. § 6372), which reads as follows:

"Whenever any person indebted to the United States is insolvent, or whenever the estate of any deceased debtor, in the hands of the executors or administrators, is insufficient to pay all the debts due from the deceased, the debts due to the United States shall be first satisfied; and the priority hereby established shall extend as well to cases in which a debtor, not having sufficient property to pay all his debts, makes a voluntary assignment thereof, or in which the estate and effects of an absconding, concealed, or absent debtor are attached by process of law, as to cases in which an act of bankruptcy is committed."

The first Congress passed a statute giving to the United States a right to priority of payment over other creditors in the class of cases therein named. It simply gave the United States a preference in the case of bonds for duties. The act was passed on July 31, 1789, and was entitled:

"An act to regulate the collection of the duties imposed by law on the tonnage of ships or vessels, and on goods, wares and merchandises imported into the United States." 1 Stat. 42, c. 5, § 21.

It declared that:

"In all cases of insolvency or where any estate in the hands of executors or administrators shall be insufficient to pay all the debts due from the deceased, the debt due to the United States on any such bonds shall be first satisfied."

Since that time Congress has passed various acts giving to the United States a priority or preference in the payment of debts due to it. A reference to the earlier statutes may be found in the margin.[1]

The Act of March 3, 1797 (1 Stat. p. 515, c. 20, § 5), provided as follows:

"And be it further enacted, that where any revenue officer, or other person hereafter becoming indebted to the United States, by bond or otherwise, shall become insolvent, or where the estate of any deceased debtor, in the hands of executors or administrators, shall be insufficient to pay all the debts due from the deceased, the debt due to the United States shall be first satisfied; and the priority hereby established shall be deemed to extend, as well to cases in which a debtor, not having sufficient property to pay all his debts, shall make a voluntary assignment thereof, or in which the estate and effects of an absconding, concealed, or absent debtor, shall be attached by process of law, as to cases in which an act of legal bankruptcy shall be committed."

The above provision, with slight verbal changes, which do not substantially alter its meaning, is embodied in section 3466 of the Revised Statutes already quoted.

[1] 1 Stat. 145, c. 35, § 45; 1 Stat. 259, c. 27, § 18; 1 Stat. 512, c. 20, § 5; 1 Stat. 591, c. 71, § 15; 1 Stat. 627, c. 22, § 65.

In 1805, in United States v. Fisher, 2 Cranch, 358, 2 L. Ed. 304, the constitutionality of Act March 3, 1797, § 5, and the Bankruptcy Act of 1800 (2 Stat. 19) were challenged in the Supreme Court of the United States in so far as they provided that in all cases of insolvency or bankruptcy of a debtor of the United States the government was entitled to priority of payment out of his effects. Chief Justice Marshall delivered the opinion of the court. The majority of the court held that the priority accorded to the United States extended to debts of every kind and constituted a valid exercise of the powers of Congress; Mr. Justice Washington, who had decided the case below, filed a dissenting opinion.

In the same year, in United States v. Hooe, 3 Cranch, 73, 91 (2 L. Ed. 370), the United States claimed priority. The Supreme Court denied unanimously the priority claimed, and Chief Justice Marshall said:

"The words of the act extend the meaning of the word 'insolvency' to cases where 'a debtor, not having sufficient property to pay all his debts, shall have made a voluntary assignment thereof, for the benefit of his or her creditors.' The word 'property' is unquestionably all the property which the debtor possesses; and the word 'thereof' refers to the word 'property' as used, and can only be satisfied by an assignment of all the property of the debtor. Had the Legislature contemplated a partial assignment, the words 'or part thereof,' or others of similar import, would have been added."

In 1814 in Prince v. Bartlett, 8 Cranch, 431, 3 L. Ed. 614, the United States claimed priority under the Act of March 3, 1797, and under section 65 of the Act of March 2, 1799. Section 65 of the last-named act declared:

"In all cases of insolvency, or where any estate in the hands of the executors, administrators or assigns shall be insufficient to pay all the debts due from the deceased, the debt or debts due to the United States * * * shall be first satisfied."

The court unanimously affirmed the court below, and, although it was admitted that the debtors were unable to pay their debts, it was held that the United States was not entitled to assert its priority. The court in its opinion said:

"It is admitted that the property seized by the attachments and executions before stated was insufficient to satisfy the several claims exhibited, and that Wellman and Ropes were unable to pay their debts, but it does not appear that their property was attached as the effects of absconding, concealed, or absent debtors; nor does it appear, or is it even alleged, that they or either of them have made a voluntary assignment of their property for the benefit of their creditors; nor is it alleged that either of them has committed an act of legal bankruptcy. It appears to be the true construction of the act to confine it to the cases of insolvency specified by the Legislature. Insolvency must be understood to mean a legal and known insolvency manifested by some notorious act of the debtor pursuant to law: not a vague allegation, which, in adjusting conflicting claims of the United States and individuals against debtors, it would be difficult to ascertain."

In 1819, in United States v. Howland, 4 Wheat. 108, 4 L. Ed. 526, the United States had filed a bill in equity in which it claimed a priority. The bill as amended alleged that the debtors had become insolvent and unable to pay their debts and thereafter had made an assign-

ment of all their property for the benefit of their creditors. Chief Justice Marshall, writing for a unanimous court, again held that the United States was not entitled under the acts of Congress to a priority, unless it appeared that the deed of assignment was a conveyance of all the property of the debtors. The deed conveyed only the property contained in the schedule and did not purport to convey all the property of the parties who made it. "The question whether the whole property is assigned," said Marshall, C. J., "is still left to conjecture, and this, being the fact on which the preference of the United States is founded, ought to be proved. Not being proved, the court is of opinion this is not a case in which it can be claimed." The Attorney General in his argument stated it was immaterial whether the priority of the United States was asserted under the act of 1797 or under that of 1799.

In 1828, in Conrad v. Atlantic Insurance Co., 1 Pet. 386, 438, 7 L. Ed. 189, the court again construed Act March 2, 1799, § 65; Mr. Justice Story writing for a unanimous court. In the course of his opinion he refers approvingly to the former decisions of the court, and declares that "a mere inability of the debtor to pay all his debts is not an insolvency within the statute, but it must be manifested in one of the three modes pointed out in the explanatory clause already referred to." The explanatory clause referred to includes the three classes of cases which relate to living debtors.

In 1832, in United States v. State's Bank of North Carolina, 6 Pet. 29, 8 L. Ed. 308, a bill in equity had been filed by the United States, in which it sought to enforce its priority where there had been a general assignment made by the debtor of his estate for the payment of debts. The claim of the United States grew out of bonds given for duties on merchandise amounting to $7,486.86, and the question was whether the priority which the United States asserted comprehended a bond executed anterior to the date of the assignment but payable afterwards. Mr. Justice Story, writing for the court, said:

"The right of priority of payment of debts due to the government is a prerogative of the crown, well known to the common law. It is founded, not so much upon any personal advantage to the sovereign, as upon motives of public policy, in order to secure an adequate revenue to sustain the public burdens and discharge the public debts. The claim of the United States, however, does not stand upon any sovereign prerogative, but is exclusively founded upon the actual provisions of their own statutes. The same policy which governed in the case of the royal prerogative may be clearly traced in these statutes; and as that policy has mainly a reference to the public good, there is no reason for giving to them a strict and narrow interpretation. Like all other statutes of this nature, they ought to receive a fair and reasonable interpretation, according to the just import of their terms."

The question now under consideration was before the court in 1838 in Beaston v. Farmers' Bank of Delaware, 12 Pet. 102, 9 L. Ed. 1017. It was conceded that the debtor bank was unable to pay all its debts, but the court held that the United States was not entitled to assert its priority. The court said:

"From the language employed in this section, and the construction given to it, from time to time, by this court, these rules are clearly established: First, that no lien is created by the statute; secondly, the priority established

can never attach while the debtor continues the owner and in the possession of the property, although he may be unable to pay all his debts; thirdly, no evidence can be received of the insolvency of the debtor, until he has been divested of his property in one of the modes stated in the section; and, fourthly, whenever he is thus divested of his property, the person who becomes invested with the title, is thereby made a trustee for the United States, and is bound to pay their debt first out of the proceeds of the debtor's property."

And the court also held that the fact that receivers had been appointed to take possession of the property of the debtor bank would not amount to such a divestiture of the debtor's property as would give the United States priority. It "would not have been a transfer and possession of the property" within the meaning of the act of Congress.

In United States v. State of Oklahoma, 43 Sup. Ct. 295, 67 L. Ed. ——, not yet [officially] reported, but decided on February 19, 1923, the Supreme Court again had this question before it. The United States brought a suit in the United States Supreme Court to establish the priority of the claim of the United States to have a debt due to it by the State Bank of Guthrie, Okl., paid before any distribution of the assets of the bank. The debt due to the United States on funds deposited in the bank was $42,000, with interest. The state's bank examiner had made an examination of the bank and found it insolvent under the Oklahoma law and unable to pay its debts, and so reported it to the bank commissioner, who had adjudged the bank insolvent and had taken possession of its assets, which were in excess of the amount claimed by the United States. Demand of prior payment to the United States, duly made by the United States, was refused by the state. The claim of priority asserted by the United States was based upon section 3466 of the Revised Statutes. The state contended that section 3466, properly construed, did not give the United States priority, and the Supreme Court sustained the contention and held the case was not within the statute. In the course of the opinion, which was written by Mr. Justice Butler, it was said:

"The claim of the United States to the asserted priority rests exclusively upon the statute. No lien is created by it. It does not overreach or supersede any bona fide transfer of property in the ordinary course of business. It establishes priority which is limited to the particular state of things specified. The meaning of the word 'insolvent,' used in the act, and of the insolvency therein referred to, is limited by the language to cases where 'a debtor not having sufficient property to pay all his debts shall make a voluntary assignment,' etc. Mere inability of the debtor to pay all his debts in ordinary course of business is not insolvency within the meaning of the act, but it must be manifested in one of the modes pointed out in the latter part of the statute which defines or explains the meaning of insolvency referred to in the earlier part. * * * Does section 3466 apply? It requires that there shall be an insolvent debtor 'not having sufficient property to pay all his debts.' The complaint does not allege that the bank's assets were not sufficient to pay all its debts. After stating that the bank examiner found that it was insolvent and unable to pay all its debts and unable to continue as a going banking concern, and that the bank commissioner pursuant to the authority vested in him by the laws of the state adjudged the bank insolvent and thereupon took charge and possession of its assets for the purpose of liquidation, the complaint does allege that the bank was and is insolvent. But the word 'insolvent' is used in different senses. Section 3466 makes it

apply only in cases where the debtor 'not having sufficient property to pay all his debts. * * *' Bankruptcy Act July 1, 1898, c. 541, § 1, 30 Stat. 544 (Comp. St. § 9585), provides: 'A person shall be deemed insolvent within the provisions of this act whenever the aggregate of his property, exclusive of any property which he may have conveyed, transferred, concealed or removed, or permitted to be concealed or removed, with intent to defraud, hinder, or delay his creditors, shall not, at a fair valuation, be sufficient in amount to pay his debts.' "

The question was somewhat elaborately considered in 1846 in the Supreme Court of Massachusetts in Commonwealth v. Phœnix Bank, 11 Metc. 129, 151. The case was argued for the United States by Benjamin R. Curtis, a very able and eminent lawyer, who afterwards became an Associate Justice of the Supreme Court of the United States. In an opinion written by Chief Justice Shaw it was held that the United States could not claim priority of payment although the bank did not have sufficient property to pay all its debts. The court said:

"It is established by a series of authorities that insolvency alone, incapacity to pay all the debts which the debtor owes, is but one circumstance only to bring the case within the statute. It must be insolvency, accompanied with the circumstance that there has been a general assignment by the voluntary act of the debtor, or a legal bankruptcy or insolvency. It is not sufficient that a debtor is incapable of paying his debts, and that the winding up of his affairs is effected, in whole or in part, by legal proceedings. Under the attachment laws of Massachusetts, the whole of a debtor's property might be attached at the suits of various creditors, and be insufficient to satisfy all his debts. It might be sold and converted into money, in a course of legal proceedings, by the sheriff, and the whole of the money, thus in the custody of the law, be paid out to creditors, and yet the United States can assert no priority. Bartlett v. Prince, 9 Mass. and 8 Cranch, ubi supra. So if a debtor should assign different portions of his property, by different instruments, to trustees, for several creditors or classes of creditors, though legal proceedings might be resorted to by creditors to enforce such trusts, yet if it were not a general assignment, nor a legal bankruptcy, it would not let in the claim for priority given to the United States by the statute. Congress might have made this act so extensive in its operation as to provide that in all cases, where a debtor's property is brought under custody of the law by sequestration, attachment, or compulsory or voluntary assignment, to be distributed amongst creditors, the United States should have priority. But we think the statute in its terms, and the judicial construction which has been uniformly given to it, is not thus extensive, but is limited to the particular cases specified. These cases, we think, are well stated in the case of Beaston v. Farmers' Bank of Delaware, 12 Pet. 133."

In the instant case the intervening petition does not allege that the defendant debtor is "insolvent." It does allege, however, that the assets of the defendant "are insufficient to pay in full the liabilities." In this respect the case now before us differs from the Oklahoma case; the Supreme Court stating in the extract above quoted from its opinion that:

"The complaint does not allege that the bank's assets were not sufficient to pay all its debts."

It does not appear to us that it is of controlling importance that the intervening petition alleges the assets are insufficient to pay the debts. In Prince v. Bartlett, supra, and in other cases as already pointed out, it appeared that the assets were insufficient to pay the debts, but the

right of priority was nevertheless denied by the Supreme Court, because the insolvency specified in the act of Congress "must be understood to mean a legal and known insolvency, manifested by some notorious act of the debtor."

We think the decisions of the Supreme Court, extending over a period of more than 100 years, have clearly established the law that the right of the United States to priority of payment is statutory, and does not apply while the debtor continues the owner of the property, even though he is unable to pay his debts. No evidence can be received of the insolvency of a living debtor until he has been divested of his property by making a voluntary assignment thereof, or has committed an act of bankruptcy, or his effects have been attached by process of law on the ground that he is an absconding, concealed, or absent debtor. Section 3466 makes a distinction between living and deceased debtors. In the case of a deceased debtor the section expressly provides that the United States shall have priority if the estate in the hands of the executor or administrator "is insufficient to pay all the debts due to the United States." In the case of a living debtor the language is quite different, and the construction which we have given to the section, as applicable to a living debtor, is one which has been given to it ever since its enactment.

3. The United States, however, at the argument in this court filed what it called a "reply brief," in which it set forth an argument not advanced in the court below, or in its original brief in this court. It asserted that the assets of the defendant corporation in the possession of the receiver are impressed with a trust to the extent of the value of the copper converted. Its contention is that, since the United States had delivered this copper to the defendant for a specific purpose and reserved title thereto, and the same was not applied to this purpose, but was wrongfully taken by the defendant and used for its own purposes, that the defendant being the bailee thereof, or holding the same in trust for the purposes of the contracts, was guilty of a conversion of the copper, and mingling the same with its own assets, and the assets of the defendant thus became impressed with a trust for the benefit of the United States to the extent of the value of the copper so converted or the cost thereof to the United States.

[4] There is no doubt that a constructive trust arises whenever another's property has been wrongfully appropriated and converted into a different form. Pomeroy's Equity Jurisprudence (4th Ed.) vol. 1, § 1051. It is equally true that where a trustee or bailee of property mingles such property with his own, so that the same cannot be identified, then the entire assets become charged with the trust for the benefit of the cestui que trust or of the bailor to the extent of the value of the property so mingled with his own. In Frelinghuysen v. Nugent (C. C.) 36 Fed. 229, 239, it was said by Mr. Justice Bradley:

"Formerly the equitable right of following misapplied money or other property into the hands of the parties receiving it depended upon the ability of identifying it; the equity attaching only to the very property misapplied. This right was first extended to the proceeds of the property, namely, to that which was procured in place of it by exchange, purchase, or sale. But if it be-

came confused with other property of the same kind, so as not to be distinguishable, without any fault on the part of the possessor, the equity was lost. Finally, however, it has been held as the better doctrine that confusion does not destroy the equity entirely, but converts it into a charge upon the entire mass, giving to the party injured by the unlawful diversion a priority of right over the other creditors of the possessor. This is as far as the rule has been carried."

[5] The above doctrine was expressly approved by the Supreme Court in Peters v. Bain, 133 U. S. 670, 10 Sup. Ct. 354, 33 L. Ed. 696. And it is well-established law that a trustee or bailee cannot use property which he holds in trust for his own benefit, and that such property cannot be subjected to his creditors to the payment of his debts. Sturm v. Boker, 150 U. S. 312, 330, 14 Sup. Ct. 99, 37 L. Ed. 1093.

But the difficulty in this case is that the United States did not apply for permission to bring suit against the receiver to recover the possession of the copper which it intrusted to the defendant as bailee. Neither did it come into court alleging that the property or the proceeds realized from its wrongful conversion were at any time in the hands of the receiver. Instead it alleged that the defendant corporation was indebted to the United States in the sum of $343,588.18 by reason of the wrongful conversion, and that payment of the sum due had been demanded, but no part had been paid. It did not come into court asserting a lien upon assets held in trust. On the contrary, it came into court asserting a right to have its debt accorded a priority and that it be preferred over all other claims in accordance with the provisions of sections 3466 and 3467 of the Revised Statutes.

[6] The argument which it now addresses to this court is altogether along different lines from the theory upon which it originally intervened. The United States now seeks to assert in this court a lien, although in the court below it asserted merely the right of priority of payment of a debt. It seems that in deliberately going, as it did, into the court below, the United States elected to treat the copper as the property of the defendant corporation, and to hold the latter as its debtor for the value thereof, and that, having done so, it cannot on the appeal to this court now argue that it is here as the owner of the copper, and has a lien, although its petition does not assert it upon the proceeds realized from the wrongful conversion of the property.

At common law the party wronged by an unlawful conversion of his personal property had at his command the three remedies of trover, trespass, and replevin. In the course of time he acquired an additional remedy, that of assumpsit. The law permitted the injured party to waive the tort, treat the wrongdoer as his agent, and upon the latter's sale of the property regard the sale as having been made for the owner's benefit, and the receipt of the consideration as held in trust for the owner; and if, instead of selling the property, the wrongdoer so used it that it could not be reclaimed, he could be sued for its value in an action for goods sold and delivered. The theory of the remedy of assumpsit was rested upon a transfer of title to the converted property from the owner to the wrongdoer or his vendees. It was the direct opposite of the theory upon which rested the reme-

dies of trespass, trover, and replevin; the theory of all three being that title continued in the injured party. The remedy of assumpsit was therefore the alternative remedy of the other three, and a resort to it was a bar to any recourse to either of the other three, and vice versa. 7 Encyc. of Pleading and Pr. 368, and cases there cited. For exactly the same reasons, when the United States came into the District Court seeking relief as a creditor, it proceeded upon the theory that the title to the copper had been transferred from it to the defendant corporation, or to its vendee, if it had been disposed of by the defendant. Having proceeded upon that theory in the court below, and failed, it is now unable, on reaching this court on appeal, to shift its position absolutely and argue that the title continued to be throughout the whole time in the intervening petitioner, and that therefore such petitioner now claims a lien upon the assets.

It is evident that the United States could proceed upon the theory of ownership of the copper in itself and sue for the recovery of it, or of the proceeds realized from its unlawful conversion, or, waiving ownership of the copper, it might sue as a creditor to recover the debt due because of the unlawful conversion. The two methods of redress are based on inconsistent theories. The general rule is that in all such cases, when the choice is once actually made between inconsistent theories and remedies, it operates as a bar, and the suitor will not be allowed to invoke the aid of the court upon contradictory principles of redress upon one and the same line of acts. A party cannot occupy inconsistent positions in the same matter. In Robb v. Vos, 155 U. S. 13, 15 Sup. Ct. 4, 39 L. Ed. 52, the court held that, when a party has two remedies inconsistent with each other, any decisive act by him, done with knowledge of his rights and of the facts, determines once for all his election of his remedy. And in Thompson v. Howard, 31 Mich. 309, 312, it was held that, where a party once makes his election between inconsistent positions, he is thereafter precluded from going back and electing again. See, also, Conrow v. Little, 115 N. Y. 387, 393, 22 N. E. 346, 5 L. R. A. 693; Butler v. Hildreth, 5 Metc. (Mass.) 49; Connihan v. Thompson, 111 Mass. 270, 272; Miller v. Hyde, 161 Mass. 472, 37 N. E. 760, 25 L. R. A. 42, 42 Am. St. Rep. 424; Long v. Long, 111 Mo. 12, 19 S. W. 537; Morrill v. Blackman, 42 Conn. 329; In re Van Norman, 41 Minn. 494, 43 N. W. 334; Gould v. Blodgett, 61 N. H. 115; Coos Bay R. Co. v. Wieder, 26 Or. 453, 38 Pac. 338; Warren v. Landry, 74 Wis. 144, 42 N. W. 247.

[7] All actions which proceed upon the theory that title to the property is in the claimant are substantially inconsistent with those which proceed upon the theory that title is in the defendant. Thus the remedies of replevin and trover are inconsistent. In one of them the plaintiff affirms his ownership of and title to the property seized; in the other, he disaffirms his ownership and title and sues for the conversion. If a plaintiff elects to resort to one of these remedies, he thereby deprives himself of any right to resort to the other. Crockett v. Miller, 112 Fed. 729, 739, 50 C. C. A. 447. And if A., who is a customer, deposits bonds by way of security with B., who

is a broker, who afterwards wrongfully transfers them and becomes bankrupt, if A. proves his claim against the estate in the bankruptcy court with full knowledge of the facts and without reservation, he cannot thereafter claim the title to the stock; for in proving his claim against the estate he deliberately waived his right to assert his title to the stock, and elected to recognize the validity of its transfer. In re Jacob Berry & Co., 174 Fed. 409, 410, 98 C. C. A. 360; Thomas v. Taggart, 209 U. S. 385, 392, 28 Sup. Ct. 519, 52 L. Ed. 845. The assertion of the one remedy precludes a resort to the other which is inconsistent with the claim first made.

[8] Before concluding this opinion we may refer to one other matter. When a judgment creditor files his bill in equity to reach the assets of his debtor, he thereby obtains a lien on the assets, which is not subject to being divested, save by payment of the judgment sought to be collected. Metcalf v. Barker, 187 U. S. 165, 23 Sup. Ct. 67, 47 L. Ed. 122. The counsel for the ancillary receiver in the instant case argued in this court that upon the filing of the bill of complaint and the service of the process a lien in equity was created upon the assets of the defendant; that the lien began with the filing of the bill, and while it is subject to all existing incumbrances it is superior to all incumbrances of subsequent date; that inasmuch as the defendant debtor had sufficient assets to pay its debts at the time the bill of complaint was filed and the receiver was appointed, as alleged in the bill, the United States had no right of priority at that time; that its right of priority only arose when the assets of the defendant became insufficient to pay its debts, which was after the appointment of the receiver; and that therefore the United States cannot assert its priority as against the pre-existing lien of the complainant. The argument is wholly inapplicable. The difficulties with it are several. It does not appear that the original bill of complaint was filed by a judgment creditor. It was not a technical creditors' bill and therefore created no lien. A creditors' bill in the technical sense, and which creates a lien, cannot be maintained unless the plaintiff has previously obtained a prior judgment in a legal proceeding. Smith v. Railroad Co., 99 U. S. 398, 25 L. Ed. 437. But the right which the United States sought to assert fails, not because the filing of the bill created a lien upon the assets of the defendant in favor of the plaintiff, which it did not, but because the mere insufficiency of the assets to pay the debts did not in itself entitle the United States to the priority which it claims.

Decree dismissing the intervening petition is affirmed.