## South Philadelphia State Bank's Insolvency.

434

Argued January 9, 1929. Before Moschzisker, C. J., Frazer, Walling, Simpson, Kephart, Sadler and Schaffer, JJ.

*Earl G. Harrison*, with him *Saul, Ewing, Remick & Saul*, for appellant.—The National Surety Company, on payment by it of the amount of the Commonwealth's deposit, became subrogated to the rights of the Commonwealth against the bank: South Phila. State Bank v. Surety Co., 288 Pa. 300; Phila. v. Fidelity & Deposit Co., 231 Pa. 208; McSorley v. Coyle, 40 Pa. Superior Ct. 560; Illinois Auto Ins. Ex., v. Braun, 280 Pa. 550

No proof of appellant's claim against the bank was required by the banking act inasmuch as its claim was that of a depositor (by reason of succeeding to the rights of the Commonwealth) and the books of the insolvent bank showed the correct amount of the deposits.

In the distribution of the assets of an insolvent State bank in which the Commonwealth of Pennsylvania was a depositor, the Commonwealth is entitled to priority of payment over other depositors and creditors: Lyle v. Richards, 9 S. & R. 322; Pennock's Est., 20 Pa. 268;

Flanagan v. Phila., 42 Pa. 219; Booth & Flinn v. Miller, 237 Pa. 297; Com. v. Lewis, 6 Binn. 266.

If the Commonwealth is entitled to such priority, a surety company, which has paid to the Commonwealth the amount of its deposit, is entitled to the same priority (a) by virtue of subrogation to the Commonwealth's rights and remedies, or (b) by virtue of the assignment executed to it by the Commonwealth: Sheaffer's Est., 281 Pa. 138; Riddlesburg C. & I. Co., 22 Fed. (2d) 644.

*Albert S. C. Millar*, for appellee.—In the case of an insolvent corporation, the rights of the parties are fixed as of the date of the appointment of the receivers: Blum Bros. v. Bank, 248 Pa. 148; Miller's App., 35 Pa. 481; Dean's App., 98 Pa. 101; Chipman & Holt v. Bank, 120 Pa. 86.

Since appellant was in the class with "all creditors other than depositors" and, being in that class, did not "make proof of" its "claim in the manner hereinafter set forth" there would seem to be little doubt but that it is "debarred from coming in upon the fund" as provided by section 41 of the act mentioned.

An assignee of claims of the Commonwealth under an assignment executed by the state treasurer, does not acquire any rights under such assignment where there is no statutory authority for the state treasurer to make such an assignment.

An insurer of the Commonwealth's deposits after payment to the Commonwealth is not subrogated to the Commonwealth's rights where the application for the bond was made by the bank and all the agreements and covenants therein were the bank's only: South Phila. State Bank v. Surety Co., 299 Pa. 300; Sheaffer's Est., 281 Pa. 138; Kates's Est., 282 Pa. 417.

If the Commonwealth, as a depositor in an insolvent state bank, is entitled to payment in full before other depositors, a surety company, which insured such state deposits and on default of the bank paid the Common-

wealth, does not acquire the Commonwealth's right to priority by an assignment from the state treasurer or by subrogation.

OPINION BY MR. CHIEF JUSTICE MOSCHZISKER, February 4, 1929:

The South Philadelphia State Bank became insolvent and was taken in charge by Peter G. Cameron, State Secretary of Banking; when he filed an account in the court below, the National Surety Company, which had entered a bond to secure the Commonwealth of Pennsylvania against loss as a depositor in the bank and had paid the Commonwealth the amount of its deposit, $10,000, claimed the right to stand, by subrogation, in the place of its payee, in all respects. This demand was listed as an "objected claim," and the court below refused to allow it, on the ground that "the surety company was a claimant, other than a depositor," which had not entered its claim within the time required by section 41 of the Banking Act of June 15, 1923, P. L. 809, 829, and therefore was entirely "debarred from coming in upon the fund." The claimant has appealed.

When the case was before us on a former appeal (288 Pa. 300), we said (at p. 305) that appellant's claim "must be presented at the time and in the way prescribed by the statute, exactly as the Commonwealth would have had to present it if the amount of the deposit was still due to it." In other words, the surety company, in presenting any claim growing out of its payment to the Commonwealth, was to act as though it were a depositor of the bank. It is enough to say, without detailing the relevant facts, that, correctly treating the claim in question as that of a depositor, the surety company presented it in the manner and within the time required by the Act of Assembly; hence the claim should have been allowed to some extent.

The broad question is, Can appellant properly claim to be entitled, by preference, to the full amount it paid the Commonwealth?

Appellant urges that, had the Commonwealth itself presented the claim, it would have been entitled to a preference which would have brought about full payment of the amount due, and that, as surety, it is entitled by subrogation, not only to the rights which the Commonwealth possessed as an ordinary depositor in the bank, but to the preference which it enjoyed over all other depositors in case of the insolvency of the depository. Whether or not the State's sovereign right of preference passed to appellant is the controlling question in the case.

When the surety company paid the Commonwealth the amount of its deposit, the state treasurer executed a written assignment to appellant of the Commonwealth's claim. Since this special assignment was made without warrant of law, it gave no greater rights to the assignee than the latter already had acquired under the equitable doctrine of subrogation: see South Phila. State Bank v. National Surety Co., 288 Pa. 300, 303. The point is, On the facts of this case, considering the rights of all the depositors in the bank, the peculiar nature of the right of preference enjoyed by the Commonwealth, and such minor considerations as present themselves, do the decided cases in this State and the general principles of our law dictate that the National Surety Company should, upon meeting its obligations under the bond which indemnified the Commonwealth, enjoy the latter's sovereign preference as a creditor, as against the rights of all other depositors?

By the common law of England, at the time of the American Revolution, the king was entitled to have a debt due the crown paid before that of any of his subjects: Attorney-General v. Andrew, 1 Hardres 22, 145 Eng. Reprint 360. This privilege belonged to the king in the capacity of parens patriæ, or universal trustee (Blackstone's Commentaries, Sharswood's ed., vol. 1, pp. 238, 240), and passed to the State of Pennsylvania in its sovereign capacity: Com. v. Lewis, 6

Binn. 266, 271; Com. v. Baldwin, 1 Watts 54, 55; Booth & Flinn v. Miller, 237 Pa. 297, 307. For an excellent general discussion and citation of cases on this subject, see U. S. Fidelity & Guar. Co. v. Bramwell, 108 Ore. 261, 217 Pac. 332.

Though the State of Pennsylvania has a sovereign right of priority over all other creditors, it by no means follows that, on the facts in this case, such right would pass to one in the position of appellant. It must be remembered that appellant, a surety obtained and paid by the insolvent bank, not by the Commonwealth, claims the right to enjoy the sovereign privileges of the latter, and this under the equitable doctrine of subrogation; the right claimed is to a preference over all other depositors of the bank. Since the right of priority of the sovereign state exists pro bono populo, it follows that where a situation arises in which the State, having been paid in full, is not immediately concerned, and where the transfer of its right of priority would result in prejudice to one class of its citizens for the benefit of another, it cannot be held that the good of all the people would thus be served. It may well be assumed that the ordinary depositor in a bank which enjoys state deposits, knowing that, in event of the insolvency of the institution, the State has the right to priority of payment, would likewise know that the laws of Pennsylvania require all state deposits to be secured by bonds with ample security thereon. Furthermore, since the doctrine of subrogation is an equitable one, the ordinary depositor might properly believe that, in event of the insolvency of their depository, if no necessity existed for the State to protect itself by exercising its sovereign right to priority of payment, that right would not be used to his prejudice, and, on such basis, he would make, or continue, his deposits; therefore, the doctrine in question should not be allowed to operate in a manner to produce prejudicial results to such depositors.

The proper rule is that the State's right to a preference over other creditors, being a sovereign right enjoyed for the benefit of all the people, cannot be transferred to individuals except by express legislative sanction (Booth & Flinn v. Miller, supra, 307), and then only to serve the interests of all the people. In Pennsylvania, no legislative warrant is found for such a course; and it may be asked, How would the interests of all the people be served, in a case like the present, should we, under the equitable doctrine of subrogation, undertake to declare that the State's right of priority passed to appellant?

The Act of February 17, 1906, P. L. 45, requires every banking institution receiving state deposits to furnish ample security against loss to the Commonwealth; and in these days of great corporations which make a business of selling security, it cannot be reasoned that, in order to obtain these purchasable bonds, it is necessary that the law should allow to those dealing in them a transfer of the State's sovereign right of priority, if the dealer be obliged to pay a debt due the Commonwealth. Such security is readily purchasable and those who deal in it may always adjust their premiums to cover the insurance risk undertaken.

We conclude that appellant surety company has the equitable right to stand in the shoes of the Commonwealth as a depositor, but not to enjoy its right of priority over other depositors. When the bank failed, the Commonwealth had all the rights of an ordinary depositor; those rights passed by subrogation to appellant. The Commonwealth had also the sovereign's right to priority of payment over other depositors, but, owing to the peculiar nature of that right, it would not pass by subrogation to appellant.

Cases may be found where the courts have allowed sureties, who paid debts due to a sovereign state, to take the latter's place in all respects; and appellant quotes from several opinions which suggest such a rule

to be the law. Some of these decisions are distinguishable on their facts, many of them are governed by statutory provisions, others are based on procedure unknown to the courts of Pennsylvania, still others indulge in unsound reasoning and cite inapplicable precedents; all of which will be explained in the course of this opinion.

The decision in Sheaffer's Est. (No. 1), 281 Pa. 138, cited by appellant, really turns more on the peculiar facts of that case than on the application of the general principles involved in the present controversy. There, the surety on a bond of a liquor distiller paid the United States revenue tax which his principal had failed to meet; subsequently, execution was issued against the latter, under which all his property was seized. Thereupon, a written agreement was entered into between the distiller and his surety, consented to by the former's creditors, the purpose being "to prevent sacrifice of the [distiller's] property." Under this written agreement, the distiller's assets were turned over to the surety, upon the stipulation that when he "realized the entire amount of the revenue tax paid by him, together with interest and costs," he should re-assign the balance on hand. The surety, and, after his death, his personal representative, worked incessantly to have Congress remit the tax, which they claimed should not have been exacted, because the property against which it was assessed had been destroyed by fire while in a bonded warehouse. These efforts were successful, and eighteen years after payment of the tax, the money was refunded by the national government. When an account in the distiller's estate came up for adjudication in the orphans' court, the estate of the surety put in a claim, which was allowed; the matter came before this court on appeal from that allowance. While we there refer to some federal cases which rule that, "where the surety on a distiller's bond pays money to the government on account of his principal, he is entitled to be subrogated

to the rights of the government and the claim is entitled to priority," we did not note that this was by virtue of federal statutes which so ordain (see statutes mentioned in annotation to Woodyard v. Sayre, 24 A. L. R. 1497, 1502, particularly 1505-6), and not by virtue of any equitable principle; although the United States courts have ample equity powers: see article on "Equity Jurisdiction in the Federal Courts," 75 Univ. of Penna. Law Rev. 287. Moreover, in the Sheaffer Case, as may be seen by the above statement of facts, the surety created (as we say in law) the fund; and the agreement between him and his principal, consented to by the latter's creditors, controlled the case. Under this agreement, the surety or his estate was clearly entitled to the amounts claimed by him, and the distiller, his estate, and consenting creditors were estopped from claiming otherwise; we there expressly so ruled. As previously stated, so far as subrogation entered into the case, it was because the act of Congress ordained subrogation, and not by virtue of any equitable principle. We may add that the syllabus of Sheaffer's Estate is misleading in part, because it states broad general principles without giving the facts to which they are applied in the opinion; that case, properly understood, contains no ruling inconsistent with our present decision.

Reed v. Emory, 1 S. & R. 338, 340, is cited in the Sheaffer Estate opinion, and in both cases the surety's privilege of taking the principal's rights against the debtor, including the right of priority of payment, was not at all by virtue of the equitable doctrine of subrogation, but by virtue of an act of Congress, which, as there shown, expressly provided that, "If the principal in any bond to the United States......shall be insolvent and the surety in such bond shall pay to the United States,......such surety shall have and enjoy the like advantage, *priority* and *preference* for the recovery and receipt of said money......as are reserved

and secured to the United States by the Act of 4th August, 1790," and this last mentioned act provides that, in cases of insolvency, debts due the United States shall be "first satisfied." (The above italics are ours.) See also Champneys v. Lyle, 1 Binn. 326, 331, and other cases involving subrogation to the rights of the federal government, all of which depended upon acts of Congress conferring the government's right of priority on the one claiming to exercise it.

As to United States F. & G. Co. v. Carnegie Trust Co., 161 App. Div. 429, 146 N. Y. Supp. 804, relied on by appellant, in there deciding that the surety was "subrogated to the State's right to a preference," the court cites federal, English and other authorities, where the privilege of exercising the sovereign's right of priority was specially granted by statute or otherwise, and did not result purely from the application of equitable principles, without noting that all-important fact; moreover, the court indulges in reasoning, to support its decision, with which we cannot agree. All of this may be said also of Orem v. Wrightson, 51 Maryland 34, and other cases following it, like, for instance, Woodyard v. Sayre, supra.

Appellant speaks of the "habit of the English Court of Exchequer to place sureties who paid the crown's debt in the situation of the crown," but a study of the cases relied on shows that this was done as an act of sovereign grace extended by the king, through the medium of "his own high court, for the collection of his debts." The king possessed the prerogative of priority (Chitty on Prerogatives of the Crown, p. 262 et seq.) and the sureties, who met the obligations of the king's debtors, had only the rights of common creditors. In the cases cited by appellant, as we read them, the court of exchequer did not grant subrogation as a matter of equitable right; on the contrary, in each instance the surety specially asked that it be "subrogated" to the sovereign right of priority possessed by the crown,

and its prayer was granted, as a matter of sovereign grace, only after the crown had given its consent. In justice to appellant, however, it should be said that its mistake, in viewing the grant of "subrogation" in those cases as a pure matter of equity, has been made also by several text writers (for examples, see Dixon on Subrogation, p. 120; Harris on Subrogation, p. 202; Sheldon on Subrogation, p. 138; 15 Halsbury, Laws of England 512) and judges, who, following someone else, apparently failed to study minutely the English cases mentioned by them, precisely the same authorities being cited in each instance. Some of these cases we shall now proceed to consider.

In Regina v. Salter (1 H. & N. 274 et seq., 156 Eng. Reprint 1207-8), relied on by appellant, we find that counsel "moved on behalf of the sureties......for an *order* that they should be placed in the situation of the crown, and that the writ of extent [used against the king's debtors] which had issued against the defendants, should be put in force on their [the sureties] behalf until they should have been reimbursed the sum paid by them in discharge of said duties." The crown, the defendants and their assignees were served, the court saying, "no one appears to oppose the application." The report then shows that the crown appeared by counsel and expressly consented to the application of the sureties. After the sovereign consent was given, and not until then, did the court allow the sureties to be "placed in the situation of the crown." In short, so far as the privilege of priority of payment is concerned, the sureties came into the king's court, not claiming an equitable right, but petitioning for an act of the king's grace, which was allowed to them only after the crown had given its formal consent. (The above italics are ours.)

The second case cited is Regina v. Robinson, reported in a note in 156 Eng. Reprint 1207-8. There, following plaintiff's application, an "order nisi" was allowed, to

show cause why plaintiff,—a surety who had met the obligation of the queen's debtor,—should not be placed in the position of the sovereign, and it was directed that this order should "be served on the defendant *and the crown*" (the italics are ours). The report closes with the words "counsel for the crown appearing and not opposing,......the rule was made absolute."

The King v. Bennett, 1 Wight. 1, 145 Eng. Reprint 1151, also cited to us, contains no ruling which indicates a procedure differing from that in the above two cases, and the several authorities mentioned in the footnote to King v. Bennett show procedure in accord with those cases. In point of fact, it is significant that, 'in all of the cases now under discussion, to carry over the crown's right of priority to the one who had paid a debt due to the king, an order, specially and particularly prayed for, was entered. There is nothing in any of these cases to suggest that the order in question was merely in the nature of a declaration signifying the operation of general law or equitable principles; on the contrary, in each instance the character of the proceeding negatives that idea.

While it is true that application of the equitable doctrine of subrogation "must depend upon the circumstances" involved (Pingrey, supra, p. 183, section 156), yet, according to the principles of equity as administered in the courts of Pennsylvania, all who happen, at any time, to occupy a particular situation, are entitled to like rights of subrogation. The American equity courts did not take over the powers exercised by the court of exchequer, to grant or decline, in individual cases, the privilege of priority in accord with the particular consent or refusal of the crown. With us, the right to subrogation, with its attending advantages, arises by operation of, and depends on, equity alone,—it, without more, works the substitution. Whereas, in the exchequer cases cited to us, where sureties were allowed to succeed to the position of the crown,—

although the result in each instance doubtless was equitable,—the substitution was by favor of the king, in that his counsel appeared and gave assent, and not purely by operation of equity principles. In every instance, apparently, the king's counsel actually and formally consented to the transfer of the crown's privilege of priority over other creditors; when and to what extent this should be done appears to have depended on the circumstances of the particular case: see The Queen v. O'Callaghan, 1 Irish Eq. 439; see also Sheldon on Subrogation 138, section 88, notes 8 and 9, and Pingrey on Suretyship and Guaranty 347, section 338, note 37; likewise Rex v. Clarke, 1 Bunb. 221, 145 Eng. Reprint 654, where subrogation was refused.

To summarize: In the English authorities relied on by appellant and by some of the text writers, the privilege of priority did not arise, and was not treated, purely as an equitable right, but was petitioned for and specially granted. Again, in our field of federal law, a series of acts of Congress serve the same end for sureties who pay debts due to the national government. None of the cases cited to us, either English or American, was controlled exclusively by the equitable doctrine relied on by appellant, and they, as well as the cases in the different states which follow them, fail, in each instance, to appreciate this fact. We disagree with the New York and Maryland view, as shown in United States Fidelity & Guaranty Co. v. Carnegie Trust Co., 161 App. Div. 429, 146 N. Y. Supp. 804, and Orem v. Wrightson, 51 Md. 34, and agree with the view of the Supreme Court of Michigan, in Zimmerman v. Chelsea Savings Bank, 161 Mich. 691, 704, 125 N. W. 424, 429, to the following effect: "Assuming the [sovereign's] right of priority......to exist in this State, the courts, in the absence of any assertion of the right by the State, and after the debtor has been divested of all control of its property in proceedings authorized by and following the statutes of the State, should not,

sua sponte, assert the right in favor of a guarantor of the debtor." In connection with this last mentioned decision, it may be noted that, even in jurisdictions where sovereign rights pass by subrogation, the surety is not necessarily subrogated to "all the prerogative rights of the government" (Sheldon on Subrogation 138, section 88, notes 8 and 9), and, hence, the right to priority of payment will not invariably pass to an indemnitor of the government.

All the English cases cited to us by appellant were decided prior to some more recent ones disclosed by our own research. In 1878, the Chancery Division of the Supreme Court of Judicature had before it the case of In re M'Myn, 33 Ch. Div. 575; CHITTY, J., there said: "I think effect should be given to the words of the [Mercantile Law Amendment Act, 1856, s. 5] which say that the surety may stand in the place and use the name of the creditor; it follows that [the surety] is entitled to obtain what she has paid.......and...... have priority over the unsecured creditors of the testatrix." It is quite plain that this decision rested on an act of Parliament, passed in 1856, and concerned the priority rights of an ordinary judgment creditor,—not a sovereign's priority. In no sense does the decision affect our understanding of the earlier cases cited to us by appellant. In 1887, the same tribunal had before it the case of In re Lord Churchill, 39 Ch. Div. 174, where, citing In re M'Myn as an authority, the court said that the right of subrogation, including the crown's privilege of priority of payment, could be taken advantage of "independently of the act," by a surety who had paid a debt due to the crown. The judge who wrote this last mentioned decision made no reference to the earlier cases, and seems to have misapplied the decision in In re M'Myn; but, be that as it may, both of these decisions were rendered long subsequent to those relied on by appellant, and in no way affect the construction we have placed upon the latter cases. When considering

the older English adjudications, cited by appellant, it must be remembered that the court which decided them arose out of the king's royal office for the collection of his taxes. The court of exchequer's original powers came directly from the crown, and it exercised none of the royal prerogatives other than those ceded to it by the king. With these facts in mind, the refusal in those cases to grant the "subrogation" prayed for, until the crown gave its express consent, must be viewed as a refusal on the part of the court of exchequer to exercise independently a prerogative power which the sovereign had not delegated to it. To interpret the cases otherwise and say that the court of exchequer called in the legal representatives of the crown merely to make sure the sovereign would not be prejudiced by the "subrogation" is to disregard the historical development of that ancient tribunal: see, at length, "The King's Counsel," by J. F. Baldwin, pp. 41, 47, 217, 219, 225, 302. Though, at the time of the older cases we are now discussing, like today, subrogation was treated under ordinary circumstances as an equitable right of sureties, yet in none of them do we find *equitable subrogation* or *prejudice* to the crown mentioned; instead, we find the plaintiff petitioning for a *prerogative* right, and the court referring to the crown's action in the matter as giving its *"consent."*

In conclusion, let us test the reasonableness of the rule insisted upon by appellant,—that, under the equitable doctrine of subrogation, an indemnitor of a creditor is always to be given the benefit of all the rights and privileges of the latter, and when the creditor is a sovereign state, its paramount right to priority of payment passes to the indemnitor,—by supposing a case where not only the debtor of the Commonwealth but the indemnitor both prove to be insolvent, yet the latter is able to and does pay one half of the principal debt, leaving the Commonwealth to claim the other half from the estate of the original debtor, with the indemnitor

also claiming against such estate by subrogation. In such a case, if the Commonwealth's privilege of priority must be shared with the indemnitor, this plainly would cause a conflict between the two, and might prejudice the Commonwealth itself. A rule which in operation could bring about these results ought not to be adopted by the courts unless ordained by the legislature as a matter of public policy. Under the English cases, if any part of the principal debt remained unpaid, though the surety had paid all for which he was bound, he was not subrogated to the crown's right of priority "in competition with the government" (Sheldon on Subrogation, 138, section 88); and there, as we have seen, counsel for the state appeared and consented before the latter's sovereign right of priority was allowed to pass to the one who had paid the debt due to it. Thus the state could avoid the possibility of prejudice. While under a system like ours, where the doctrine of subrogation is administered according to general equity principles alone, in the absence of appropriate legislation wisely regulating such matters, we can imagine many instances where a transfer of any part of the state's sovereign privilege of priority might bring the transferees in active competition with the Commonwealth to the prejudice of the latter. It may be well to add, that succeeding to the priority of the state is materially different from taking over a right of priority vested in an ordinary creditor by virtue of contractual relations between the latter and the principal debtor. The last mentioned right, being contractual in its inception, may, for purely equitable reasons, pass to the surety when he pays any part of the principal debt; while the state's right to priority is a sovereign prerogative, assumed by it, and not subject to equity jurisdiction. In the first case, the surety succeeds only to a right which the debtor created, when solvent. In the second, he attempts, under the doctrine of equitable subrogation, to take over a sovereign right, as-

sumed by the state to serve its own purposes; and this, in our opinion, cannot be done without legislative authority. Under our law as it now stands, the Commonwealth's rights as a depositor passed by subrogation to appellant, but its sovereign right to priority of payment over other depositors did not so pass. The court below will make distribution accordingly.

The decree appealed from is reversed to the extent above indicated; costs to be paid out of the fund.