FRY *v.* EQUITABLE TRUST CO.

1. Banks and Banking—State's Prerogative to Preference—Constitutional Law.

    If prerogative inhered in State to priority of its deposits in insolvent bank over claims of other depositors and creditors resulting from adoption of English common law, it was abrogated as to banks and banking associations by constitutional provision giving to bill-holders of insolvent bank preference in payment over all other creditors, not excepting State (Const. 1850, art. 15, § 5; Const. 1835, Sched. § 2; Const. 1850 and 1908, Sched. § 1).

2. Same—Statutes.

    Enactment of general banking act, constituting complete and comprehensive code, fully governing business of banking, abrogated any previously existing rights of State to priority of its deposits in insolvent bank (3 Comp. Laws 1929, § 11898 *et seq.*).

3. STATES—LOAN OF STATE CREDIT—CONSTITUTIONAL LAW—BANKS
   AND BANKING—PREFERENCE.
   Deposit of State moneys in bank without preference in pay-
   ment thereof over other depositors of bank is not loan of
   State credit in violation of Constitution (art. 10, §§ 12, 15).

4. SAME—DEPOSIT IN BANK NOT LOAN OF STATE CREDIT.
   Deposit of State moneys in bank, in ordinary course of busi-
   ness, as authorized by Constitution, is not loan of State
   credit within constitutional inhibition (Const. art. 10, §§ 12,
   15).
   McDONALD, C. J., and POTTER, J., dissenting.

Mandamus by Theodore I. Fry, State treasurer,
for and in behalf of the State of Michigan, to compel
Equitable Trust Company, a Michigan corporation,
and others, its conservators, to make repayment in
full of a deposit of State moneys. Submitted June
13, 1933. (Calendar No. 37,319.) Writ denied
June 29, 1933.

*Patrick H. O'Brien*, Attorney General, and *Ira
Z. Acoff* and *Charles F. Cummins*, Assistants At-
torney General, for plaintiff.

*Harold B. Desenberg* and *Clayton C. Purdy*, for
defendants.

FEAD, J. This is mandamus to require repayment
in full, as a preferred claim, of a deposit of State
moneys.

The Equitable Trust Company is in a condition
of suspended animation, pending reorganization or
receivership, in charge of conservators appointed
by the banking commissioner, with the consent of
the governor, under Act No. 32, Pub. Acts 1933.
The conservators have refused the demand of the
governor, State treasurer, and attorney general,
made in behalf of the State, for immediate payment

of a deposit of $10,000 of State moneys, made by the State treasurer and secured by a corporate surety depository bond, approved as provided in 1 Comp. Laws 1929, § 348.

The State claims preference over all other depositors and creditors of the trust company on the ground that such preference is a sovereign prerogative inhering in the crown at common law and attaching to the State on its adoption of the common law.

The courts are in hopeless conflict on the existence of the prerogative in the respective States, its force in the law, its waiver, loss, and susceptibility to subrogation. But the weight of authority sustains the prerogative in States which have adopted the common law. The literature on the subject may be found in *United States Fidelity & Guaranty Co.* v. *Bramwell* (1923), 108 Ore. 261 (217 Pac. 332, 32 A. L. R. 829); *People* v. *Farmers' State Bank* (1929), 335 Ill. 617 (167 N. E. 804, 65 A. L. R. 1327); *In re South Philadelphia State Bank's Insolvency* (1929), 295 Pa. 433 (145 Atl. 520, 83 A. L. R. 1123); *Shaw* v. *United States Fidelity & Guaranty Co.* (1932) (Tex. Com. App.), 48 S. W. [2d] 974 (83 A. L. R. 1113); 65 A. L. R. 1331; 51 A. L. R. 1355, and the authorities cited therein.

This is a test case. Counsel ably have presented a number of interesting questions, such as the effect of depository laws, deposit at interest, appointment of a receiver, and general statutes on insolvency on waiver or loss of the prerogative. These questions need not be discussed. It is agreed that the banking laws are applicable, and, in our opinion, they are determinative.

The judicial history of the prerogative in this State is brief. In *Commissioner of Banking* v. *Chel-*

*sea Savings Bank* (1910), 161 Mich. 691, the prerogative was claimed by the surety on a depository bond which sought subrogation to the State's preference. The prerogative was denied by the attorney general in his brief and doubted by the court in this language:

"The form of our government, the undoubted power of the legislature in this behalf, furnish reasons for saying that in adopting the applicable rules of the common law as a part of the law of the State, the people did not adopt and thereby assert an arbitrary, prerogative right to priority of payment of its debts, which was recognized by the common law. In any event, the State has never asserted, and does not now assert, such a right."

The prerogative also darted in and out of *Reichert* v. *United Savings Bank* (1931), 255 Mich. 685 (82 A. L. R. 33), without alighting. So far as can be ascertained, this is the first time it has been claimed by the State. In *Board of Chosen Freeholders of Middlesex County* v. *State Bank* (1878), 29 N. J. Eq. 268, (1878), 30 N. J. Eq. 311, the court thought that nonuser for 100 years was sufficient to negative the prerogative. At least, such nonuser would cast doubt upon the present existence of the prerogative while the unfavorable consideration it had from the attorney general and this court on its former presentation and the injury it would work to general bank depositors forbid the rejection of fair evidence of its abrogation or waiver.

If the prerogative inheres in this State, it is by virtue of the adoption of the common law in our Constitution. In the Constitution of 1835 the common law was not adopted in express terms. The schedule, § 2, read:

"All laws now in force in the territory of Michigan, which are not repugnant to this Constitution,

shall remain in force until they expire by their own limitations, or be altered or repealed by the legislature.''

By construction, the court held ''all laws'' to include the common law. *Stout* v. *Keyes,* 2 Doug. 184, 188, 189 (43 Am. Dec. 465).

In the Constitutions of 1850 and 1908, schedule, § 1, read:

''The common law and the statute laws now in force, not repugnant to this Constitution, shall remain,'' etc.

We will assume that the prerogative inhered in the State at one time. Has it been abrogated or waived?

The Constitution of 1850, art. 15, § 5, provided:

''In case of the insolvency of any bank or banking association, the bill-holders thereof shall be entitled to preference in payment over all other creditors of such bank or association.''

The provision was the mandate of the people in the exercise of the highest attribute of sovereignty under our form of government, the adoption of a Constitution. It was a limitation of power and bound all departments, executive, legislative, and judicial, to conserve the expressly declared preference. The constitutional preference was repugnant to the sovereign prerogative. No exception was made in favor of the State. The prerogative was not preserved, either in whole, as superior or equal to, or in part, in subordination of, the expressed preference. The prerogative, therefore, was abrogated as to banks and banking associations and could have no future force without constitutional or statutory re-enactment.

Preference to the State is inadmissible on another principle. Since 1850 banking has been treated in this State as a thing apart. Because of the evils which had developed from the general banking act of 1837 (see *Green* v. *Graves,* 1 Doug. 351), the Constitution of 1850, art. 15, § 2, provided that no general banking law should take effect until approved by the people at a general election. The Constitution of 1908, art. 12, § 9, requires that banking legislation have the votes of two-thirds of the members-elect to each house of the legislature.

Under these provisions, three general banking acts have been adopted. Two, Act No. 135, Laws of 1857 (1 Comp. Laws 1871, § 2182 *et seq.*), and Act No. 205, Pub. Acts 1887 (3 How. St. § 3208a *et seq.*), were approved by the people, and Act No. 66, Pub. Acts 1929 (3 Comp. Laws 1929, § 11898 *et seq.*), was enacted by the legislature. Amendments have been made from time to time, as lately as the legislative sessions of 1931, 1932 (1st ex. sess.), and 1933.

The banking act of 1857 was rather sketchy but the acts of 1887 and 1929 were complete and comprehensive codes, fully governing the business of banking. The latter has been so declared by this court. *Stewart* v. *Algonac Savings Bank,* 263 Mich. 272. It is a recognized rule that general laws do not apply to such codes. *Leach* v. *Exchange State Bank* (1925), 200 Iowa, 185 (203 N. W. 31). In *Cook County National Bank* v. *United States* (1882), 107 U. S. 445 (2 Sup. Ct. 561), the court held that a general statute giving the United States preference as a creditor does not apply to the national banking act:

"The provisions of that law and of the national banking law being, as applied to demands against national banks, inconsistent and repugnant, the

former law must yield to the latter, and is, to the extent of the repugnancy, superseded by it. The doctrine as to repugnant provisions of different laws is well settled, and has often been stated in decisions of this court. A law embracing an entire subject, dealing with it in all its phases, may thus withdraw the subject from the operation of a general law as effectually as though, as to such subject, the general law were in terms repealed. The question is one respecting the intention of the legislature. And although as a general rule the United States are not bound by the provisions of a law in which they are not expressly mentioned, yet if a particular statute is clearly designed to prescribe the only rules which should govern the subject to which it relates, it will repeal any former one as to that subject.''

In point is *Commonwealth* v. *Commissioner of Banks* (1922), 240 Mass. 244 (133 N. E. 625), in which the State made claim of preference under the common-law sovereign prerogative, and it was denied, among other grounds, because—

''It is a general principle that, when legislation covers the entire field, previous provisions of either the common or statutory law in conflict therewith become no longer operative.''

In its reply brief, the State contends that a law permitting deposit of State moneys without preference would be invalid, as a loan of State credit in violation of the Constitution, art. 10, § 12 (*White* v. *Pioneer Bank & Trust Co.,* 50 Idaho, 589 [298 Pac. 933], followed in *Lawson* v. *Charter,* 112 W. Va. 108 [163 S. E. 813]), and, as an express law could not defeat the preference, it could not be waived by the legislature.

This contention, if sound, would not revive the prerogative abrogated by the Constitution of 1850.

At most, it might nullify the effect of the general banking laws to waive it.

We cannot follow the reasoning of the cited cases. Preference as a creditor has nothing to do with the power to loan State credit. The credit cannot be loaned under any conditions or upon any security. Nor, if illegally loaned by means of a deposit, would a preference as a creditor be created thereby. Preference and the doctrine of following trust funds must not be confused. Aside from the fact that our Constitution, art. 10, § 15, recognizes the legitimacy of the deposit of State moneys in banks, we do not think a deposit kept in the ordinary course of business can be considered a loan of State credit within the constitutional inhibition.

Denial of the sovereign prerogative of preference, clearly demanded on legal grounds, does not thwart the will of the people, violate the intention of the legislature, nor work injustice.

The preference to bill-holders in the Constitution of 1850 was not a casual piece of legislation. It, with other provisions, was a considered attempt by the people to maintain the integrity of State bank currency after their experience with "wild cat money," and was a pledge to the world that the bill-holders should have first claim on the assets of the bank. And the failure of the State to reserve a preference in cases of banks was in accord with its already declared policy as to insolvent corporations and individuals. R. S. 1846, chaps. 118, 144; Comp. Laws 1871, p. 1852, § 6607, p. 2002, § 7265.

The act of 1887 provided for distribution of assets of an insolvent bank by means of "ratable dividends" on all claims proved (3 How. Stat. § 3208f6). By Act No. 194, Pub. Acts 1893, it was enacted that savings assets should be segregated

and held for the payment of savings depositors.
The same provisions have been incorporated un-
changed in the revised and codified banking act of
1929 (3 Comp. Laws 1929, §§ 11928, 11962) and con-
stitute the present law, except as to certain pref-
erences (not including general State deposits) de-
clared by Act No. 32, Pub. Acts 1933, an emergency
measure, expiring by limitation on June 1, 1935.
If the latter act is of any effect at bar, it emphasizes
the view that the legislature intended that the State
have no preference.

The provisions for "ratable dividends" in the
Act of 1887 followed so closely the language of the
national banking act of 1864, 13 U. S. Stat. at L.,
p. 115 (12 USCA, § 194), that it evidently was
modeled thereon. The adoption and retention of
such basis of distribution were for the purpose of
putting State banks on a parity with national banks,
in order that banking in the State should be uniform
and depositors have equal rights. It is significant
of the intention of the legislature and people in 1887
that it already had been decided that the Federal
government has no preference as a creditor in na-
tional banks (*Cook County National Bank* v. *United
States* [1882], *supra*), and of the legislature of
1929, that it also had been held that no preference
in national banks can arise out of the State law.
*Davis* v. *Elmira Savings Bank* (1896), 161 U. S. 275
(16 Sup. Ct. 502).

It seems clear that the people and legislature in-
tended to provide and continue distribution of assets
of State banks without governmental preference, in
harmony with the rule governing national banks.
The law requiring security for State deposits and
the general State policy on preferences afforded
justification for such intention.

The resurrection of the sovereign prerogative of preference at this time, after almost a century of coma, from which it has been aroused only once before, and then to encounter the disfavor of the executive law officer of the State and the court, could not be otherwise than unfair to the people of the State, who, for 46 years, have been depositing moneys in State banks in a justified belief that, in case of the insolvency of a bank, the distribution of assets would be made in accordance with the written law enacted by them and re-enacted by their representatives. Since 1855 the State has had the advantage of separate "good and ample security" for its deposits. 1 Comp. Laws 1929, § 348. If a State preference were imposed on the assets of a bank, the sureties on the State depository bonds or the security deposited would profit at the expense of the depositors. If prevailing business conditions imperil the State's security, common fairness requires that the loss to the whole people (the State) be borne by the whole people rather than it be shifted to a small part of the people (the other depositors). And, in any event, the State retains the advantage over others of double assurance against loss by way of participation ratably with other depositors in the assets of the bank and such recovery as its separate bond or security may avail.

On both strict legal principles and equitable considerations, we must hold that the State has no sovereign prerogative of preference as a creditor of banks over other depositors and creditors.

Writ of mandamus denied.

CLARK, SHARPE, NORTH, WIEST, and BUTZEL, JJ., concurred with FEAD, J.

POTTER, J. (*dissenting*). The question is whether the common-law prerogative of the crown to preference and priority of payment in case of the insolvency of a depositary of public funds has become vested in the sovereign State of Michigan.

Upon separation of the colonies from Great Britain, the Continental Congress declared:

"That, as free and independent States, they have full power to levy war, conclude peace, contract alliances, establish commerce, and, to do all other acts and things which independent States may of right do." (1 Comp. Laws 1929, p. 11.)

Article 2 of the articles of confederation and perpetual union between the several States provides:

"Each State retains its sovereignty, freedom, and independence and *every power,* jurisdiction, and right which is not by this confederation expressly delegated to the United States in Congress assembled." (USCA, pt. 1, p. 10.)

By the ordinance of 1787 the supreme court of the Northwest Territory was given common-law jurisdiction. The common law was adopted by the legislative department of the Northwest Territory and it continued in full force and effect in Indiana territory when Michigan was a part thereof. It was not abrogated by the act of the governor and judges of Michigan of September 16, 1810, 1 Terr. Laws, pps. 210, 900; and is now in full force in Michigan, and has been since this territory came under jurisdiction of the government of the United States. *Stout* v. *Keyes,* 2 Doug. 184 (43 Am. Dec. 465); *Lorman* v. *Benson,* 8 Mich. 18 (77 Am. Dec. 435); *In re Lamphere,* 61 Mich. 105.

Section 3, art. 4, of the Constitution of the United States, provides for the admission of new States into the Union. The ordinance of 1787 provided for

the admission of new States "on an equal footing with the original States in all respects whatsoever." (1 Comp. Laws 1929, p. 99.)

The act of Congress of June 15, 1836 (5 U. S. Stat. at L. 49), provided:

"That the State of Michigan shall be and is hereby declared to be one of the United States of America and is hereby admitted into the Union upon an equal footing with the original States, in all respects whatever." (1 Comp. Laws 1929, p. 104.)

*Commissioner of Banking* v. *Chelsea Savings Bank,* 161 Mich. 691, is based upon the erroneous and untenable theory that prerogative rights are arbitrary, not sovereign; capricious, not reasonable; exercised at the whim of an individual, not by fixed rule of law. The most casual examination of the Commentaries of Blackstone, on the Prerogative of the Crown, commended by Holdsworth in his History of English Law, shows the thing discussed is the orderly classified limitations upon exercise by the King of England of sovereign prerogative power.

In the United States each State has all of the powers of sovereignty inherent in the British crown except those delegated to the government of the United States, and the sovereign prerogative here means the inherent right of the people to exercise those powers not specified either in the Constitution of the United States or reposed in the legislature of the State, but inherent in the people of the State, and to be exercised by the executive officers of the State.

It is argued that because the Federal government does not exercise a prerogative right to preference and priority in the assets of defunct depositaries, independent of statute, it does not have the sover-

eign prerogative right to claim such preference. The government of the United States is one of limited, defined, delegated powers. All powers not delegated by the people to the government of the United States are retained by the States and by the people. This is a cogent reason why, independent of Federal statutes, the government of the United States may not exercise a sovereign prerogative right to preference and priority in the payment of claims against insolvent depositaries and the several States may exercise such sovereign right and prerogative. In fact, in *Commissioner of Banking* v. *Chelsea Savings Bank, supra,* it is said:

"We do not doubt that the State may provide by legislation for a preference of payment of demands due to the State. The legislatures of some of the States and the congress of the United States have, to some extent, given a preference to demands due to the government. The right to do this is inherent in the State. It is exercised in this State, in a limited way in the collection of the revenues. It has at all times been, as it now is, within the power of the legislature to make such provisions for State priority as seemed to be expedient."

The Constitution of 1850 was framed and adopted by men who had witnessed the growth, development, and results of the "wild-cat" banking system, built up in Michigan under the general banking law of 1837 (Act No. 47, Laws of 1837); the inflation of State bank currency; the operation of the bank guaranty plan; the collapse and closing of the banks in the State; the reduction in value of the currency of such banks, finally wiped entirely out by the decision of the court in *Green* v. *Graves,* 1 Doug. 351. Many members of the Constitutional Convention of 1850 were opposed to banks. It was provided no banking law should be adopted by the State unless it was

first submitted to and ratified by the people, who could thus exercise directly their sovereign prerogative power, and then such bank was to be subject to the constitutional provision and restriction that, "in case of the insolvency of any bank or banking association the bill-holders thereof shall be entitled to preference in payment over all other creditors of such bank or association." Article 15, § 5, Const. 1850.

This clause was not aimed to suspend, surrender, or destroy the prerogative power of the people in whom the ultimate sovereignty is reposed. It was adopted in the belief it would stabilize the money of State banks, which constituted the principal circulating medium in use at the time, and, though the bank of issue closed, would be some guaranty against the utter worthlessness of the bank's non-interest bearing notes which circulated as money. So in case of the collapse of a bank if the State exercised its sovereign prerogative power and demanded preference and priority in payment, such prerogative would operate upon the money of the bank, the money which its assets might bring, the money of other banks in its possession, and if the prerogative was exercised, it would be exercised against money which by the Constitution constituted a preferred claim against the assets of the banks. It aimed to make the money of the State banks, in which the people and the State were interested, good, and cannot be construed as in any way affecting the exercise of the prerogative right of the State to assert preference and priority in payment. It is said that because the statutes of this State have never declared the State entitled to preference and priority of payment in case of insolvency, such right does not exist. This is substantially the reasoning of *Commissioner*

*of Banking* v. *Chelsea Savings Bank, supra,* and it is directly contrary to the established principles of law governing the sovereign prerogative.

"The prerogative is the name for the remaining portion of the crown's original authority, and is therefore the name for the discretionary power left at any moment in the hands of the crown, whether such power be, in fact, exercised by the king himself or by his ministers. Every act which the executive government can lawfully do without the authority of an act of parliament is done by virtue of this prerogative." Dicey, Const. p. 369.

Because the State has not, for nearly a century, asserted this power, it is argued it does not exist. For nearly a century treason against the State has been punishable by death, but, because no one has been hanged for treason against the State, may it be argued the offense no longer exists?

The sovereign prerogative power exists. It is conceded it is inherent in the people—and the people organized constitute the State. It is and always has been executive in its nature, existing independent of statute, not existing or vanishing at the whim or caprice of enactments by the legislature, as suggested in *Commissioner of Banking* v. *Chelsea Savings Bank, supra.* It is a power ever present in the State, over which the legislature has no control, existing independent of statute, executive in character, and may be asserted and exercised by the executive officers of the State, on behalf of the State, when the welfare of the State demands, in their judgment, its exercise. Being a power inherent in the State, it has never been parted with by the State.

The legislature may not, under our Constitution, encroach upon the exercise of executive powers and functions by the governor and other executive offi-

cers provided for in the Constitution whose duty it is to see that the laws are faithfully executed, to do which, revenue must at all times be available. The State is entitled to exercise its inherent sovereign prerogative through its executive officers, to demand preference and priority of payment of public funds deposited in insolvent depositories.

The State, as against every other people, State, or nation, owns and controls all of the real estate and personal property within its territorial confines. Under its sovereign power and prerogative it is or may be necessary for the effective functioning of the State that by the exercise of that power it claim preference and priority of payment in the distribution of the assets of insolvent depositaries. When money is deposited in a bank by the State, such bank, created by the State, takes with knowledge it belongs to the State, and while the relation of debtor and creditor ordinarily exists between a bank and its depositors, yet when a bank accepts a deposit with knowledge such deposit consists of trust funds —State funds belonging to the people—neither the bank nor the people have a right to complain if the State claims and exercises its sovereign prerogative to preference and priority in payment.

The system of government now prevailing in the United States is based upon the theory that all sovereign power resides in the people; the State has all the powers of the government of England save as restricted by the State and Federal Constitutions. Certain limited powers have been delegated by the people—the source of sovereignty—to the government of the United States. All other powers are reserved by the Constitution of the United States to the States and to the people. The Constitution of this State defines and limits the powers which may

ordinarily be exercised by the several departments of government, but back of these lies the sovereign power of the people which makes and unmakes constitutions, the inherent right of self-preservation. This sovereign prerogative power gives the right to demand that which belongs to it, which has been paid to the State by the people of the State. Such money originated with the people, belongs to the people, and may be recovered by the people, in the exercise of their sovereign prerogative power, regardless of whether or not the people's public agents —the legislature of the State—has said they may do so or not.

Money belonging to the State belongs in fact to the people. Money contributed by taxation ultimately reaches the treasury of the State. The people to whom it belongs have no personal control over where it shall be deposited. This is governed by the discretion of public officials in pursuance of law. The private depositor controls his own money. He may deposit it or not deposit it as he pleases. He may pass upon the desirability of depositaries and direct where his money shall go.

The sovereign prerogative power in England is exercised by the executive head of the government. In this country it has for its source the sovereignty of the people. There is no reason why it should not be exercised by the executive department of government. Its exercise works no injustice. If the money is recovered from a defunct depositary it is disbursed for the benefit of the people to whom it belongs.

The writ of mandamus should issue as prayed.

McDONALD, C. J., concurred with POTTER, J.