National Surety Company (et al., Appellants) *v.* Franklin Trust Company, Appellant, et al.

502

Argued December 5, 1933. Before FRAZER, C. J., SIMPSON, KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*Claude B. Wagoner,* with him *Glenn A. Troutman, Charles S. Wesley,* Special Attorneys, *Shippen Lewis,* Special Attorney General, and *William A. Schnader,* Attorney General, for defendant, appellant in No. 292.

*Frederick H. Spotts,* with him *James A. Montgomery, Jr.,* and *Pepper, Bodine, Stokes & Schoch,* for intervening plaintiffs, appellants in Nos. 293 and 294.

*Frederick W. Gourlay,* with him *Lewis, Adler & Laws* and *Felix & Felix,* for intervening plaintiff, appellant in No. 309.

*Herbert A. Barton,* with him *Swartz, Campbell & Henry,* for intervening plaintiff, appellant in No. 308.

*Earl G. Harrison,* with him *Murray Forst Thompson, Thomas P. Mikell* and *Walter Biddle Saul,* of *Saul, Ewing, Remick & Saul,* for plaintiff-appellee.

OPINION BY MR. JUSTICE SIMPSON, January 15, 1934:
The school district of the City of Philadelphia, as a condition precedent to the deposit of any of its funds with the Franklin Trust Company, required of the latter indemnity in the sum of $500,000, which was given as follows: by the United States Fidelity & Guaranty Company two bonds in the sum of $100,000 each, and by the Union Indemnity Company, the Maryland Casualty Company of Baltimore and the Glens Falls Indemnity Company each one bond in the sum of $100,000. Several years later, as the result of negotiations growing out of the desire of the Glens Falls Indemnity Company

to be released from liability on its bond, it was finally arranged that if the trust company could obtain an acceptable new bond for $75,000, with some other company as surety, and could obtain from the school district and deliver to the Glens Falls Indemnity Company, for cancellation, its $100,000 bond then outstanding, it would execute and deliver a new indemnity bond to the school district in the sum of $25,000.

In order to accomplish this, the trust company made application to the National Surety Company for a bond of $75,000 in favor of the school district, but it refused to execute and deliver such a bond until and unless the trust company deposited $75,000 of the bonds of the United States Government as counter-indemnity to the surety company. On these terms the negotiations were finally concluded. The National Surety Company executed its bond for $75,000 in favor of the school district, and the trust company delivered to the Pennsylvania Company for Insurances on Lives & Granting Annuities, the stakeholder agreed upon by the parties, "$75,000 par value, United States Treasury 3¼% Bonds, 1946-56, with March 15, 1932, and subsequent coupons attached." The receipt for the bonds executed and delivered by the Pennsylvania Company, stated that "These bonds are deposited to the joint account of the Franklin Trust Company, and/or the National Surety Company, subject to a further agreement which will be lodged with us," but they were in fact deposited to counter-indemnify the National Surety Company, as above set forth. The "further agreement" referred to in the receipt was agreed to and prepared, but before it could be delivered to the Pennsylvania Company, in the usual course of business, the trust company and all its assets were taken over by William D. Gordon, secretary of banking of the Commonwealth of Pennsylvania, and since that time the trust company has been debarred from transacting any business whatever.

At the time this occurred the school district had on deposit with the trust company the sum of $300,035.50, which the former demanded that its indemnitors should forthwith pay, and this they respectively did as follows:

United States Fidelity and Guaranty Co. ....$120,000.00
Union Indemnity Co. .................... 60,000.00
Maryland Casualty Co. ................. 60,000.00
Glens Falls Indemnity Co. ............... 15,000.00
National Surety Co. ..................... 45,035.50

Total ..........................$300,035.50

The latter company, in order that it might, by their sale, obtain a fund from which it could be reimbursed for the $45,035.50 it had paid, demanded of the Pennsylvania Company a delivery to it, the National Surety Company, of the $75,000 of Government Bonds so as aforesaid held by the former, which refused to deliver them, however, unless the secretary of banking would consent thereto. He refused to consent; whereupon the National Surety Company filed the bill in equity in this case, against the trust company in the hands of the secretary of banking, and the Pennsylvania Company, praying a decree that said $75,000 of Government Bonds be delivered over to it, the plaintiff. Subsequently the other four surety companies, who had helped pay the school district, claiming that they were interested in the fund which would be realized on the sale of the bonds, asked and were granted leave to intervene as parties plaintiff.

Answers to the bill in equity were filed by the original defendants and the intervening plaintiffs were excused from filing any pleadings. All the parties in interest were then duly heard, and, after exceptions to the adjudication of the chancellor had been dismissed, a final decree was entered directing (1) a sale of the Government Bonds, (2) that out of the proceeds realized thereby the National Surety Company should receive its $45,-035.50 with interest, (3) that the "costs of all parties to

this proceeding shall then be paid," and (4) that whatever remained should be divided among the four other indemnity companies, in proportion to the amounts which they had respectively paid to the school district of Philadelphia on account of liability on their respective bonds of indemnity. These five appeals were then taken, one by the Franklin Trust Company in the hands of the secretary of banking, and one each by the other four indemnitors between whom the final distribution was directed to be made.

The following questions are raised and were elaborately and skillfully argued:

1. Had the Franklin Trust Company authority in law, to deliver its Government Bonds to indemnify the National Surety Company, in order that thereby it might be able to continue to hold the large deposit of the school district?

2. If there was such authority, did the court below err in directing the preferred payment of $45,035.50 to the National Surety Company and only the balance to the other four sureties, instead of directing that the whole of the proceeds be divided rateably among all five surety companies?

3. Ought not the entire proceeds of the sale of the Government Bonds, or, if the preferred payment to the National Surety Company was right, ought not the surplus, after making that payment, be paid to the secretary of banking for the benefit of the depositors of the trust company, who are its preferred creditors?

We have so recently decided (Cameron v. Christy, 286 Pa. 405; Cameron v. Allegheny County Home, 287 Pa. 326) that such trust companies have the right to pledge their assets to secure their deposits, as the giving of the Government Bonds in effect was, that we may be excused from saying anything further on this subject. It may be as well to state, however, that herein the secretary of banking at one time contended also that the pledge of the Government Bonds and the agreement in regard thereto,

were not authorized by the proper officials of the trust company. In his brief in this court, however, he expressly abandons this objection. In determining the other questions involved, therefore, we start with the implied concession that the decree of the court below, in so far as it directed the sale of the Government Bonds, was proper, and hence the only points to be decided are: to whom and in what proportions shall their proceeds be distributed? Upon these points we have no direct authority in this State, and the authorities from other jurisdictions, cited to us by appellants and appellee, are "equally positive and mutually irreconcilable." We are thus free to decide the other points upon principle, and this we shall now do.

"As the right of contribution between cosureties is founded on equitable principles, contribution will not be enforced between them when it would be inequitable": 1 Brandt on Suretyship (3d ed.), section 289. "With us, the right of subrogation, with its attending advantages, arises by operation of and depends on equity alone": South Phila. State Bank's Insolvency, 295 Pa. 433, 445. What, then, does equity require as between the National Surety Company, on the one hand, and the other four indemnitors and the secretary of banking on the other?

When the trust company applied to the National Surety Company for the additional bond of $75,000, the latter was under no legal or equitable obligation to the trust company, the school district or the other four indemnitors, to give the bond. It had the right to give or to refuse to give it, and it had the right to stipulate the terms on which it would so do, if at all. If it chose to refuse to enter the desired security, unless it received counter-indemnity, the other four indemnitors had no standing to complain; nor had they if the trust company accepted the suretyship on the stipulated terms, and delivered the counter-indemnity agreed upon. Admittedly, at that time the National Surety Company was not a cosurety with any of the other parties in interest, and

hence, as against it, there was no equity in favor of the other four indemnitors. The authorities appear to be uniform that a proposed later surety may stipulate that it shall not, in the matter of required counter-indemnity, either then or thereafter become a cosurety with others already bound, and this is so even though, upon consummation of the proposed suretyship, it becomes a cosurety in matters thereafter arising. The true basis of this conclusion, no matter what reasons may have been given for it, is the inalienable right of every one to contract upon such terms, not illegal, as he chooses. Hence, the National Surety Company had the right to fix the terms upon which it would assume liability, and with us no one could say it nay. There is an abundance of authority for this conclusion: See 50 C. J., section 471, 21 R. C. L. 1155, section 194, and cases in the footnotes to each thereof; Hoover v. Mowrer, 84 Iowa 43; Commissioners of McDowell Co. v. Nichols, 131 N. C. 501; Security Savings Bank v. Peddicord, 196 Iowa 215; Latham v. Brewer, 201 Mo. App. 469. These cases likewise hold that, even though there are other sureties for the same loss, the one bargaining for indemnity, as a condition precedent to becoming bound, is entitled to be paid in full out of the security thus acquired. There are antagonistic authorities on this point, in jurisdictions of as high a standing as those above referred to, but in none is there even a reference to the basic and fundamental reason upon which we plant our conclusion; and hence we decide that, on the distribution of the proceeds of the Government Bonds, the National Surety Company is entitled to receive its claim in full, with interest, as the court below decided it was.

The only other question to be decided is: Who is entitled to the ultimate surplus on the sale of the Government Bonds? Upon this point we disagree with the court below. As we have already said, the National Surety Company and the earlier indemnitors were not cosureties at the time those bonds were delivered to the

Pennsylvania Company, and hence there was then no relation of trust and confidence between it and them. Had the default of the trust company occurred at that time and the bonds had then been sold, the surplus, after fully indemnifying the National Surety Company, would have reverted to the trust company. It does not appear whether or not there was an express agreement on this point, nor is it a matter of moment, since there is a necessary implication to that effect growing out of the fact that the bonds were delivered to the Pennsylvania Company for the purpose of indemnifying the National Surety Company, and for no other purpose. At that time, the other four indemnitors had no interest in the bonds; so far as appears they were not considered or even mentioned at the time the indemnification agreement was made. Nor did the trust company either then or thereafter make any payment or give any further security to the National Surety Company. If this fact was otherwise, it might, perhaps, be argued that since the National Surety Company was, at that later time, a cosurety with the others, the trust company was bound to treat all the cosureties alike. But that argument cannot possibly have any effect under the existing circumstances, since, as we have said, the trust company made no payment to and gave no security to the National Surety Company, after it became a cosurety with the other four indemnitors, if, indeed, it ever so became. It follows that, as the status which existed at the time the Government Bonds were pledged for the indemnification of the National Surety Company continued unchanged, the method of distribution of the proceeds of the bonds also continued unchanged, and hence the surplus from the sale of the bonds must go back to the trust company, in the hands of the secretary of banking.

The decree of the court below is affirmed except in so far as it directs the surplus on the sale of the bonds to be divided among the other four indemnitors, which surplus we now decree must be paid to the Franklin Trust

Company, in the hands of William D. Gordon, secretary of banking of the Commonwealth of Pennsylvania. The costs on these five appeals are to be paid out of the fund for distribution.