# In re Erie Trust Company

*Henry C. Baur* and *English, Quinn, Leemhuis & Tayntor*, for petitioners.
*Gunnison, Fish, Gifford & Chapin*, for respondents.
*John B. Brooks* and *Alban W. Curtze*, for receiver.

HIRT, J., May 29, 1934.—This matter is before the court on the petition of a depositor in the savings department of Erie Trust Company, now in liquidation, with whom other depositors have joined, praying for such order as may be necessary to recover for the benefit of all depositors of the bank bonds, with their accompanying mortgages, aggregating in face value about $1,500,000, pledged by the bank to D. N. McBrier, F. B. McBrier, and A. W. Milne to secure a so-called "special deposit" made by them. The petition avers that the resolution of the board of directors of the bank, pledging these assets as security for the repayment of the special deposit, and the agreement made pursuant thereto were ultra vires, illegal, and void, and that inasmuch as the pledge of these assets was not reflected in the subsequent published statements of the bank, and actual notice thereof was not given depositors, the whole transaction was fraudulent as to them.

To this petition, answers have been filed by William D. Gordon, Secretary of Banking, by the substituted trustees appointed by the court to make collections on the pledged mortgages, and by D. N. McBrier, F. B. McBrier, and A. W. Milne, denying that the bank was insolvent at the time of making the pledge, averring that the transaction was for the benefit of the bank and all depositors, and denying fraud, either actual or constructive.

The essential facts, shorn of immaterial detail, are stated in the course of the following discussion:

Early in this industrial depression, the people's faith in banks began to waver and in 1931 became acute. Apparently, in this community, whether or not justified, much of this lack of faith was directed against Erie Trust Company and manifested itself in increasing demands upon the resources of the trust company by depositors who insisted upon closing out their accounts. In this case, it is important to bear in mind that we are concerned with the situation as it existed on November 4, 1931, and at that time, although in the

previous month depositors had withdrawn funds to the extent of about $900,-000, the trust company was nevertheless solvent.

To provide cash to maintain legal reserves and to meet this drain of withdrawals the trust company from time to time had borrowed from Guaranty Trust Company and Chemical National Bank & Trust Company, of New York. On November 4, 1931, these loans amounted to $947,000 and were obtained by the trust company only upon depositing marketable securities, the quickest and best assets of the bank, with a market value of about $1,400,000, as security for the loans. The terms of these loans were unfavorable in that they were callable monthly.

According to the testimony, the officers of the trust company considered it important that these marketable securities be recovered because of the danger that the loan might be called and the pledged securities sacrificed in an unfavorable market, and for the further reason, as given by them, that these securities, if recovered, would furnish resources upon which the trust company could raise money quickly to meet emergencies of the future. To pay off this New York loan of $947,000 and to recover the marketable securities pledged, the board of directors of Erie Trust Company, prior to November 3, 1931, selected a block of mortgages amounting, in face value, to about $1,500,000 upon which to raise the necessary cash. These mortgages, for the most part, were long-term real estate loans for which, according to the testimony, there was no market. If there was no opportunity for raising funds by a sale of these mortgages, the trust company had the alternative either of borrowing upon the mortgages as collateral or of creating a special deposit secured by assignment of the block of mortgages. This last method was the one adopted, and the trust company entered into an agreement in writing with D. N. McBrier, F. B. McBrier, and A. W. Milne, under the terms of which these three directors supplied $1,100,000 to the credit of Erie Trust Company. From this fund, the trust company paid its loans with the New York banks, amounting to $947,000, and reclaimed its marketable securities pledged for these loans. D. N. McBrier, F. B. McBrier, and A. W. Milne were then credited on the books of Erie Trust Company with a special deposit of $1,100,000, and the trust company issued its passbook to them in the usual form as evidence of the deposit. In accordance with the terms of the agreement, the trust company delivered the block of mortgages in question to these depositors, and with each mortgage delivered an assignment piece in blank. The depositors were obliged to keep the mortgages in their own vault box in Erie Trust Company, subject to the right of the agent of the trust company to inspect the same on reasonable notice. Payments of principal and interest were to be collected by the trust company, to be paid to the depositors periodically in reduction of their deposit, and when the deposit should be paid in full the remaining uncollected mortgages were to be reassigned to Erie Trust Company. These depositors were to receive interest on the deposit at a rate equal to, but no higher than, what they were obliged to pay on the loans made by them in New York, where they, as individuals, borrowed the entire sum of $1,100,000 with which to create the deposit.

What was accomplished then, on November 4, 1931, by the trust company and these three depositors amounts to this: For the former liability of the trust company on its New York loans was substituted the liability of the trust company on this special deposit, and by the pledging of this block of mortgages, marketable securities of about the same value were reclaimed from the New York banks.

These facts raise a legal question of fundamental and vital importance which

may be stated thus: Is there legal authority for the act of Erie Trust Company in creating a special deposit in favor of these three directors?

In considering this question, we are bound to bear in mind that Erie Trust Company is not a "banking institution" in the ordinary sense, governed by general banking laws: Gordon, Secretary of Banking, v. Winneberger, 310 Pa. 362; but that it is a trust company of a peculiar type, and that its status, rights, and powers are defined and limited by the particular acts of assembly under which it was organized.

Erie Trust Company was incorporated in 1902 under section 2, par. 19, and section 29 of the General Corporation Law of April 29, 1874, P. L. 73, not as a bank but as a company for the insuring of titles to real estate. By supplementary legislation, further powers had been granted from time to time to this class of corporations, among them the powers of a trust company and of receiving deposits. The Act of May 29, 1895, P. L. 127, gave the additional power "to receive deposits of moneys and other personal property and issue their obligations therefor, to invest their funds in and to purchase real and personal securities, and to loan money on real and personal securities."

Before this Act of 1895, and as early as 1877, the Supreme Court of this State decided that the bank in that case, incorporated by a special act of assembly, had the power to give a mortgage to one of its directors as security for his deposit in consideration of his maintaining a large deposit in the bank, that this act of the bank did not require the approval of the stockholders, and, further, that the special depositor was entitled to the benefit of his security against the claims of general depositors and other creditors when that bank finally became insolvent: Ahl v. Rhoads et al., 84 Pa. 319.

In 1926, the precise question here involved was before the Supreme Court, and it was specifically held that trust companies, incorporated under the Act of April 29, 1874, and its supplements (the identical acts of assembly under which Erie Trust Company was incorporated) have the power under the amending Act of May 29, 1895, P. L. 127, to pledge assets to secure deposits. The following is the language of the Supreme Court in stating that conclusion: "the power given by the Act of 1895 'to receive deposits of money and other personal property and issue their obligations therefor' is ample authority to sustain the transaction here involved. The power to issue an 'obligation' for a deposit fairly implies a power to pledge securities therefor when necessary to safeguard the return of the deposit when called upon by the depositor . . .": Cameron v. Christy, 286 Pa. 405, 409.

And as late as January 15, 1934, in the case of National Surety Company et al. v. Franklin Trust Co. et al., 313 Pa. 501, 506, the Supreme Court again affirmed the right here involved, in the following language: "We have so recently decided (Cameron v. Christy, 286 Pa. 405; Cameron v. Allegheny County Home, 287 Pa. 326) that such trust companies have the right to pledge their assets to secure their deposits, as the giving of the Government Bonds in effect was, that we may be excused from saying anything further on this subject."

True, in the leading case of Cameron v. Christy, supra, the assets of the bank were pledged to secure a deposit of tax moneys, which were public funds, but in Ahl v. Rhoads et al. the security was given to a director of the bank as security for his private deposit, and in National Surety Co. et al. v. Franklin Trust Co. et al. the pledge was given to a bonding company which had indemnified the City of Philadelphia against loss on the deposit. In considering the sole question of the authority of the trust company to pledge assets to a

depositor, it is unimportant whether the funds be public moneys or private, for, in the Act of 1895, supra, giving trust companies of this class the power to pledge securities to safeguard the return of a deposit there is no limitation upon the power granted. These authorities of the Supreme Court of this State are binding upon us and are the settled law on this phase of the case, and it would be vain, futile, and presumptuous on our part to disregard them.

Decisions have been called to our attention which hold that banks generally, especially National banks, do not have this power. We not only recognize these authorities but are in accord with the principles involved and believe that no bank or trust company should have the power to prefer one depositor over another, except perhaps where the deposits of public funds are involved; but these decisions have to do with banks which were not organized under the legislation by which Erie Trust Company was incorporated and to which the Act of 1895, supra, does not apply; and insofar as we are not in sympathy with the authority of these trust companies to create special deposits our quarrel must be directed solely against the legislation which makes it possible.

This brings the discussion to the second phase of the case, raising the following question of law: Does the fact that the published financial statements after November 4, 1931, gave no notice to general depositors that mortgages in the amount of $1,500,000 had been pledged as security for the special deposit constitute fraud, either actual or constructive, upon the rights of general depositors?

The first published financial statement of the trust company after the creation of the special deposit appeared in the newspapers in January of 1932, and this statement contains no reference to the fact that the mortgages in question had been assigned as collateral for the special deposit, and the general depositors had no actual notice of that fact.

The Secretary of Banking of this Commonwealth had supervision of the affairs of Erie Trust Company, and under the provisions of section 15 of the Act of June 15, 1923, P. L. 809, it was the duty of the trust company to submit periodical financial statements to the Banking Department on call. During the latter part of 1931, the Secretary of Banking twice called for reports of the condition of Erie Trust Company, one as of September 29, 1931, and the other as of December 31, 1931; the first of these calls was before, and the second after, the creation of the special deposit in question. A condensed statement of the report made on December 31, 1931, was published in Erie newspapers in the general form prescribed by the Banking Department. Petitioners in this case complain that a comparison of the two statements, of September 29, 1931, and December 31, 1931, shows a reduction in bills payable between the two dates and an increase in time deposits by a substantial amount. The item of time deposits in the statement of December 31, 1931, amounting to $7,211,-149.89, includes $1,100,000 represented by the special deposit, and the specific complaint is that a comparison of these two bank statements by anyone without knowledge that $1,500,000 in assets had been assigned, would justify the conclusion, from the reduction of the bills payable and the increase in deposits, that the financial condition of the bank had been improved; and this is a logical conclusion from such comparison, for reduction of bills payable and increase of deposits are both indicia of financial health. The differences, having regard to nice distinctions between a loan and a deposit, in our opinion do not affect the question involved, for a time deposit, in effect, is a loan to the bank. But if the parties had completed the transaction in the form of a loan it would have appeared in the bank statement as a bill payable, whereas an increase in the bank's liability to depositors does not bear that implication.

But, being mindful of the principle of law that fraud is not to be presumed but must be proven by evidence which is clear, precise, and indubitable, can we say that the published statement of December 31, 1931, convicts these special depositors of fraud? There are a number of circumstances which rebut such inference. Among them might be mentioned the fact that a copy of the contract creating the special deposit was sent to the Secretary of Banking at the time that it was entered into, and the Banking Department at all times was fully informed of the details of the transaction, including the fact that the mortgages were assigned, and made no objection either to the agreement, to the deposit, or to the pledge of the mortgages. Another fact rebuts the inference of intentional fraud. On November 4, 1931, D. N. McBrier had on deposit, in an unsecured demand account with Erie Trust Company the sum of $96,452.30, and this account was actually increased to $140,335.55 when the trust company closed. Both the other special depositors had large deposits in unsecured accounts. There are other facts to which reference need not be made.

Not only did the trust company make reports to the Banking Department in accordance with the law, including the details of the special deposit, but the published statements complied with the law and with the practice generally as to both form and substance. The published statements were condensed and abstract summaries, and were published in the form prescribed by the Banking Department. Under the general practice, assets pledged by a bank are regarded still as the property of the bank and no reference of the pledge is made in published statements. This general practice is shown rather clearly in the testimony of a retired bank examiner of long experience in Pennsylvania, called as a witness on behalf of petitioners, who said that, while a statement in this form does not reflect the true condition of the institution, yet "any other bank in the same position would have rendered in public and sworn to just such a statement as that. It is not customary to show pledged assets in the published statements or in any other statement issued by the bank not carried on their books. It is in the nature of a contingent liability which is not shown. In my opinion, which has not been asked for, I would say that I think the law has been lax in that respect." And with this conclusion we agree.

Therefore, since Erie Trust Company, at a time when it was solvent, exercised powers given it by the legislature in creating the deposit in question, and in the published statements of financial condition complied with the law, both as to substance and form, we are without authority to grant the relief prayed for.

And now, to wit, May 29, 1934, the prayer of petitioner and of intervenors is denied, and the petition dismissed at their costs.

From Otto Herbst, Erie, Pa.